UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KISHORE NATH, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:21-cv-06365-BMC |
| Plaintiff, | AMENDED CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| LIGHTSPEED COMMERCE INC., DAX DASILVA, and BRANDON BLAIR NUSSEY, | |
| Defendants. | |

Lead Plaintiff Debrob Investments Limited ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lightspeed Commerce Inc. ("Lightspeed" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Lightspeed securities

between September 11, 2020 and September 28, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Lightspeed provides commerce enabling Software as a Service (SaaS) platform for small and midsize businesses, retailers, restaurants, and golf course operators in Canada, the United States, Germany, Australia, and internationally.  The Company's cloud platforms are designed interrelated elements, such as omni-channel consumer experience, a comprehensive back-office operations management suite to improve customers' efficiency and insight, and the facilitation of payments.  Lightspeed's platform functionalities include full omni-channel capabilities, order-ahead and curbside pickup, point of sale, product and menu management, employee and inventory management, analytics and reporting, multi-location connectivity, loyalty, customer management, and tailored financial solutions.

3.     Lightspeed was founded in 2005 as Lightspeed POS Inc.[1]  In March 2019, Lightspeed conducted an initial public offering on the Toronto Stock Exchange, issuing 15 million shares at $16 per share and raising $240 million in Canadian dollars (the "Canadian IPO").  In September 2020, the Company conducted an initial public offering and listing on the New York Stock Exchange ("NYSE"), issuing 10,896,196 Subordinate Voting Shares at $30.5 per share for a total gross consideration of $332.3 million (the "U.S. IPO").

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically,

---

[1] In August 2021, the Company changed its name to Lightspeed Commerce Inc.

Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lightspeed had misrepresented the strength of its business by, *inter alia*, overstating its customer count, gross transaction volume ("GTV"), and increase in Average Revenue Per User ("ARPU"), while concealing the Company's declining organic growth and business deterioration; (ii) Lightspeed had overstated the benefits and value of the Company's various acquisitions; (iii) accordingly, the Company had overstated its financial position and prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.    On September 29, 2021, market analyst Spruce Point Capital Management ("Spruce") published a report regarding Lightspeed, entitled "Putting the Brakes on Lightspeed" ("Report").  Ben Axler, the Founder and Chief Investment Officer of Spruce, authored the report. Spruce Point also issued a press release summarizing its findings.  The summary stated, among other things, that "[e]vidence shows that Lightspeed massively inflated its business pre-IPO, overstating its customer count by 85% and gross transaction volume ('GTV') by 10% – a payment volume metric that a former employee described as 'smoke and mirrors;'" that there was "[e]vidence of declining organic growth and business deterioration through Lightspeed's IPO, despite management's claims that Average Revenue Per User ('ARPU') is increasing;" and that the Company's "[r]ecent acquisition spree has come at escalating costs with no clear path to profitability, while management pursues aggressive revenue reporting practices."

6.    On this news, Lightspeed's stock price fell $13.73 per share, or 12.2%, to close at $98.77 per share on September 29, 2021 on unusually heavy volume.  Just three months later, on February 2, 2022, Lightspeed announced that Defendant Dasilva would step down as CEO, effective immediately.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  In addition, Lightspeed's securities trade on the NYSE, located in this Judicial District.  Finally, pursuant to Lightspeed's most recent Annual Report, as of March 31, 2021, there were 128,528,515 of the Company's Common Shares outstanding.  Accordingly, there are presumably hundreds, if not thousands, of investors in Lightspeed's securities within the U.S., some of whom undoubtedly reside in this Judicial District.

11.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff, as set forth in the certification previously filed with this Court, acquired Lightspeed securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.    Defendant Lightspeed is a Canadian corporation with principal executive offices located at 700 Saint-Antoine Street East, Suite 300, Montréal, Québec, Canada H2Y 1A6. The Company's securities trade in an efficient market on the NYSE under the ticker symbol "LSPD."

14.    Defendant Dax Dasilva ("Dasilva") has served as Lightspeed's Chief Executive Officer and as a Director at all relevant times. The Company's Registration Statement makes clear that Defendant Dasilva exerts significant control over Lightspeed:

> Our Multiple Voting Shares have four votes per share and our Subordinate Voting Shares have one vote per share. Dax Dasilva, our founder and Chief Executive Officer, beneficially owns and controls all of our Multiple Voting Shares and will hold approximately 39.84% of the voting power attached to our outstanding voting shares following this Offering (assuming no exercise of the Over-Allotment Option) and 38.88% of the voting power attached to our outstanding voting shares following this Offering (assuming full exercise of the Over-Allotment Option), and will therefore continue to have significant influence over our management and affairs and over all matters requiring shareholder approval, including election of directors and significant corporate transactions.

15.    Defendant Brandon Blair Nussey ("Nussey") has served as Lightspeed's Chief Financial Officer at all relevant times.

16.    Defendants Dasilva and Nussey are sometimes referred to herein as the "Individual Defendants."

17.    The Individual Defendants possessed the power and authority to control the contents of Lightspeed's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Lightspeed's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions

with Lightspeed, and their access to material information available to them but not to the public,

the Individual Defendants knew that the adverse facts specified herein had not been disclosed to

and were being concealed from the public, and that the positive representations being made were

then materially false and misleading.  The Individual Defendants are liable for the false statements

and omissions pleaded herein.

18.    Lightspeed and the Individual Defendants are collectively referred to herein as

"Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.    Lightspeed provides commerce enabling Software as a Service (SaaS) platform for

small and midsize businesses, retailers, restaurants, and golf course operators in Canada, the

United States, Germany, Australia, and internationally.  The Company's cloud platforms are

designed interrelated elements, such as omni-channel consumer experience, a comprehensive

back-office operations management suite to improve customers' efficiency and insight, and the

facilitation of payments.  Lightspeed's platform functionalities include full omni-channel

capabilities, order-ahead and curbside pickup, point of sale, product and menu management,

employee and inventory management, analytics and reporting, multi-location connectivity,

loyalty, customer management, and tailored financial solutions.

20.    Lightspeed was founded in 2005 as Lightspeed POS Inc.  In March 2019,

Lightspeed conducted the Canadian IPO, issuing 15 million shares at $16 per share and raising

$240 million in Canadian dollars.  In September 2020, the Company conducted the U.S. IPO,

issuing 10,896,196 Subordinate Voting Shares at $30.5 per share for a total gross consideration of $332.3 million.

21.     Throughout the Class Period, beginning with the Company's IPO and listing on the NYSE in September 2020, Defendants misled investors regarding its organic growth, customer count, GTV, APRU, and acquisition strategy.  The allegations set forth in paragraphs ¶¶ 22-49, which establish the  falsity of Defendants' Class Period statements (*see* ¶¶ 52-82 below), are based not only on the findings of the Spruce Report (the credibility of which is demonstrated in ¶¶ 93-94 herein) but also on Plaintiff's own investigation validating the contents of the Spruce Report via use of the Wayback Machine[2], a review of obscure statements buried within conference call transcripts and corporate filings pre- and post- IPO, as well as interviews of numerous former Lightspeed employees whose statements corroborate one another.

### Lightspeed Overstates Key Performance Metrics Including Gross Transaction Volume ("GTV") and Customer Count

22.     Using the Wayback Machine to scrape customer and GTV counts, an analysis undertaken by the Spruce Report and replicated by Plaintiff's investigation, suggests that Lightspeed's business was already stalling pre-IPO and has massively overstated both its GTV and customer count, both identified by the Company as key performance metrics.

23.     The Spruce Report cites a former employee as stating that Lightspeed's reported GTV numbers are "PR" and "smoke and mirrors."  Specifically, the former employee, seemingly referring to the $16.3 billion in GTV Lightspeed reported on August 5, 2021 for the quarter ended June 30, 2021, stated:

> "The $16 billion GTV number is a PR number. That is anything that is going through Lightspeed. It could be their own payments, integrated payments, residual

---

[2] The Wayback Machine is a digital archive of the World Wide Web founded by the Internet Archive, a nonprofit based in San Francisco, California. Created in 1996 and launched to the public in 2001, it allows the user to go "back in time" 25+ years to see how websites looked in the past. *See* archive.org/web/.

payments. This is the volume that looks like it's being processed, there's no way to say there's money backed up behind it." "It's not verified payments…It could be somebody could go and write a million dollar transaction and never collect payments. Like there's no way for them to see actual business or not. What they record is that it seems like in the platform, this is how much money is passing through." "It is not clear. If it was the value of integrated payments they reported, where they know there is a physical transaction behind it, that would be much more realistic." "I think there is a lot of smoke and mirrors in the PR deck and all of this. They are not very transparent about how and where the pockets of growth are, especially for payments. They are very good at PR, and saying we're going to acquire this, this, this, but I don't know if there will be a breaking point where all these acquisitions are not going to play well together. It looks great on paper but when you go into practice, how is this going to operate beyond just numbers on a PR deck."

24.     Plaintiff interviewed additional former Lightspeed employees who corroborated that Lightspeed's metrics, and GTV in particular, are indeed "smoke and mirrors."  For example, Confidential Witness ("CW") 5[3], who's entire timeframe of employment at Lightspeed occurred during the Class Period and included the quarter ended June 30, 2021, stated that Lightspeed's internal reporting on key business metrics and other data was "like smoke and mirrors," and the company's data strategy was "pretty horrendous."  CW5 expressed a lack of surprise at the contents of the Spruce Report.  Similarly, CW7[4] who also worked at Lightspeed for most of the Class Period, described a conversation with Vice President – Partnerships Peter Dougherty, where Dougherty told CW7 that Lightspeed could report GTV equal to the "entire transaction" with customers, "not what we're making on the transaction."  As an example, CW7 explained that if Lightspeed facilitates a $100 transaction by a customer, and after taking out fees Lightspeed receives $85, the Company would report the full $100 as revenue.  Indeed, CW7 stated that

---

[3] CW5 worked for Lightspeed from February 2021 through July 2021, upon its acquisition of Upserve, as Senior Manager- Customer Engagement Systems and Project Manager- Strategic Programs.  CW5 described the job as a "chief of staff" type role and focused on customer experience and improving processes of users and customers, specifically with regard to the post-sale systems process. CW5 left because of the "incredibly toxic environment" at Lightspeed.

[4] CW7 worked at Lightspeed from January 2021 until December 2021 as a Strategic Partnerships Development Manager focusing on payments partnerships following the ShopKeep acquisition.

Lightspeed used the payment processing platform Stripe specifically because it "allows us to report on the entire transaction." Referencing the Spruce Report, CW7 explained that this is what the former employee quoted referred to as "smoke and mirrors."

25.    Lightspeed began overstating its GTV as early as 2014 and revisions were made pre-IPO, reducing it by $1.5 billion.  At no point in touting the Company's GTV at the time of the IPO or thereafter, did Defendants reveal Lightspeed's nefarious history of wildly overstating its GTV and customer count.

26.    In early 2014 the Company listed $6 billion in transactions on its website, revised the number upward significantly to $7.3 billion in August 2014, to $7.5 billion in September 2014, and then to $8.2 billion in October 2014 following its acquisition of POSIOS.  During that same timeframe, Lightspeed claimed to have over 200 certified "Resellers" worldwide on February 2, 2014, changing the number to over 150 nineteen days later, and then revising it upward again to over 250 "Partners" on May 9, 2014.  At the time Lightspeed claimed over 150 in Resellers in February 2014, it also claimed over 60% in revenue growth, a claim it later removed, replacing it with a claim of 120% in growth of transactions processed in May 2014.

27.    Then in December 2015 Lightspeed claimed 34,000 customers and $12 billion in GTV on its website yet in a video uploaded by Lightspeed to youtube.com in September 2016 stating that as of 2015, it had 24,000 customers worldwide and $8 billion in transactions processed annually.

28.    Subsequently, pre-IPO in November 2018, Defendants claimed Lightspeed had $15 billion in annual transactions processed but revised the number down $2 billion to $13 billion in March 2019.  Then, in its 2019 Annual Report for the fiscal year ended March 31, 2019, Defendants claimed Lightspeed's 2018 annual GTV was $10.6 billion and its 2019 annual GTV

was $14.5 billion—substantially lower than the numbers previously reported on the Company's website.

29.    In addition to massively overstating its GTV numbers, the Spruce Report and Plaintiff's investigation uncovered that Lightspeed also misstated its customer count, another key performance metric.

30.    In November 2018, Lightspeed's website showed that they had 50,000 customers worldwide and generated over $15 billion GTV, suggesting that each customer generated around $500,000. On March 7, 2019, Lightspeed disclosed in their IPO prospectus that they had $13 billion GTV and over 47,000 customers. However, according to the GTV per customer calculated with 2018 data, Lightspeed in fact only had around 27,000 customers, a 74% overstatement, and 46% less customers than it reported 5 months earlier.  This egregious misstatement in customer count is further confirmed by an analysis of disclosures pertaining to average revenue per user ("APRU").  On March 7, 2019, in its IPO prospectus, Lightspeed disclosed an average monthly APRU of $200 and revenue of approximately $64 million.  APRU represents the total software and payments revenue of the Company divided by the number of unique customers during the same period.  Based on that calculation, Lightspeed had 26,664 customers, consistent with the GTV calculation demonstrating a 74% overstatement in customer count.

31.    Lightspeed also vastly overstated its Total Addressable Market ("TAM").  In an August 2019 investor presentation, Lightspeed stated a TAM of $113 billion but, despite almost $2.5 billion in acquisitions, reported a $16 billion TAM in its August 2021 prospectus, an 86% decline.

**Lightspeed Masks Evidence of Declining Organic Growth**

32.    After its IPO, Lightspeed laid out its organic growth plan and listed "attracting new merchants" as its first objective in its year end Q4 2019 conference call. On the following call for

Q1 2020, the Company reported 2,000 net new merchants on its system. Thereafter, Lightspeed stopped disclosing net new merchant adds and began acquiring companies to artificially increase its customer base and mask a decline in organic growth.

33.    Lightspeed also quietly altered its definition of ARPU three times, burying the subtle change within its filings, to make it seem as though ARPU continued to increase.  In its 2019 Annual Report, Lightspeed defined ARPU as the total software and payments revenue of the Company in the period divided by *the number of unique customers* of the Company in the period. In the fourth quarter 2020 MD&A, Lightspeed changed the ARPU definition to total software and payments revenue of the Company in the period divided by *the number of unique customers, or by the number of customer locations, as the context indicates*.  In Q2 2021 MD&A, Lightspeed changed the definition again calculating ARPU only as total software and payments revenue of the Company in the period divided by *the number of customer locations* of the Company in the period. These subtle changes enabled Lightspeed to swap the denominator from the larger customer count number to a smaller customer location number, thereby artificially increasing the ARPU metric, virtually undetected.

34.    Indeed, a former employee told Spruce that "ARPU as a whole has dropped significantly," despite the Company's claims to the contrary:

> It is because Shopify and Square give free hardware. Lightspeed is going to have to change, and they are going to have to give away free hardware. They are still using printers that haven't changed in the last two and a half decades. When you look at the decrease in software ARPU and take into account the negative margin on the hardware, ARPU as a whole has dropped significantly

35.    Moreover, Defendants failed to disclose to investors that Lightspeed pursued the ShopKeep, Upserve and Vend acquisitions to acquire their customers thereby masking their own organic growth decline, with no plans to integrate these companies into Lightspeed, leverage their technology and functionality, and despite the fact that each company suffered its own financial

woes at the time of the acquisitions (ShopKeep was near bankruptcy and had limited growth; Upserve's business was in decline; and Vend was falling severely short of its financial expectations.) Tellingly, Lightspeed's Senior Vice President of Global Sales, an early LightSpeed employee, left right before these large acquisitions.

36.    A balance sheet allocation analysis following the Company's acquisitions of ShopKeep, Upserve, and Vend reveals that Lightspeed's organic growth was declining, contrary to its public statements to investors.  In Q3 2021, Lightspeed engaged in three large acquisitions: ShopKeep ($545m), Upserve ($412m), and Vend ($372m). Backing out each acquisition's contributions to deferred revenue and receivables reveals evidence of declining organic growth, which directly contradicts Defendants' claims of 42% organic software and payments revenue growth in its core business:

**Organic Deferred Revenue and Trade Receivables Growth**

| FY 2021 | $ in mm | | FY 2021 | $ in mm |
|---|---|---|---|---|
| Q3'21 Deferred Revenue | $44.0 | | Q3'21 Trade and Receivables, Net | $9.8 |
| Less: ShopKeep Addition | ($4.4) | | Less: ShopKeep Addition | ($3.1) |
| Less: Upserve Addition | ($3.4) | | Less: Upserve Addition | ($2.7) |
| **Pro Forma Q3'21 Deferred Revenue** | **$36.2** | | **Pro Forma Q3'21 Receivables** | **$4.0** |
| Q2'21 Deferred Revenue *QoQ Change* | $36.9 *-1.9%* | | Q2'21 Trade Receivables, Net *QoQ Change* | $5.6 *-28.5%* |
| Q3'20 Deferred Revenue *YoY Change* | $42.4 *-14.6%* | | Q3'20 Trade Receivables, Net *YoY Change* | $4.8 *-16.7%* |

37.    Moreover, while touting organic growth on the Q1 2022 investor conference call, Defendants failed to reveal that without the contribution of receivables to its balance sheet from the Vend acquisition, Lightspeed's receivables in fact declined quarter-over-quarter by 20%:

12

| Organic Receivables Growth | |
|---|---|
| **$ in mm** | |
| Q1'22 Trade and Receivables, Net | $13.4 |
| Less: Vend Addition[(2)] | ($3.9) |
| **Pro Forma Q1'22 Trade Receivables** | **$9.5** |
| Q4'21 Trade Receivables, Net **QoQ Change** | $12.0 **-20%** |

38.    CW1[5] explained that prior to the ShopKeep acquisition, ShopKeep was Lightspeed Retail's most direct competitor, that they "didn't differ a ton," and targeted the same size retailers, a lot of the same price points, and same functions. According to CW1, though Lightspeed touted upgraded capabilities of Lightspeed Retail based on the advantages of ShopKeep, the company did not in fact build those advantages into Lightspeed.

39.    According to CW2[6], Defendants Dasilva and Nussey, along with President JP Chauvet, gave a virtual presentation via Google Meet to all ShopKeep employees during Thanksgiving week in 2020, right after the acquisition.  They told ShopKeep employees that Lightspeed had acquired the company for its 25,000 customers, to add "in more customer base to theirs because they wanted to grow as quickly as possible and to really start penetrating the U.S. and really tapping into this market," because Lightspeed "hadn't really penetrated the U.S. market."  Defendant Dasilva and Chauvet specifically stated they wanted ShopKeep's 25,000

---

[5] CW1 worked as an Account Executive, Senior Account Executive and Team Lead from April 2021 through February 2022 and came onboard via Lightspeed's acquisition of ShopKeep.  At ShopKeep, CW1 worked as an account executive from December 2019 through April 2021.
[6] CW2 also came to Lightspeed from ShopKeep via the acquisition and worked at Lightspeed from November 2020 to October 2021 as a "Support Specialist II- ShopKeep and Weekend Manager- ShopKeep."

customer base to put them over 100,000 total customers at the time. CW2 stated that Dasilva spoke about creating a "unified product" incorporating ShopKeep but "that never happened." Lightspeed then acquired Vend in 2021 purportedly for the same purpose as the ShopKeep acquisition. CW8, who worked at Lightspeed following the ShopKeep acquisition from February 2021 to May 2021 as a Senior Manager- Brand Retention and Customer Experience echoed CW2s statements regarding Lightspeed's motivation for acquiring ShopKeep simply to add to its customer count, and its failure to integrate its acquisitions despite lofty promises to do so.

40.    According to CW3[7], "there was constant confusion among employees about the different companies that Lightspeed had acquired." CW3 made clear that Lightspeed's "goal was to acquire, and it seemed like a bunch of smoke and mirrors." CW3 stated that a few days after the Upserve acquisition, Defendant Dasilva and President JP Chauvet gave a Zoom presentation where they touted Upserve's contribution to Lightspeed's customer base, and that "we have over 100,000 customers with you guys." Post-acquisition CW3 stated that there was no plan communicated for integrating Upserve with Lightspeed's Restaurant product. CW3 also stated that the Spruce Report "makes total sense," explaining that Lightspeed bought revenue streams to "pretend we have customers because we acquired customers on paper and make things look good." During monthly companywide meetings, Defendant Dasilva talked a lot about customer count.

41.    CW4[8] explained that according to internal explanations given during weekly "Bug Ticket Triage Meetings," Lightspeed pursued the ShopKeep, Upserve, and Vend acquisitions for

---

[7] CW3 worked at Lightspeed from December 2020 to May 2021 as a SaaS (Software as a Service) Manager responsible for all of Lightspeed's SaaS operations, following Lightspeed's acquisition of Upserve, where CW3 worked since February 2019. CW3 left Lightspeed because "of the dysfunction that quickly became apparent after the company acquired Upserve."

[8] CW4 worked as a Frontline Support Specialist, Escalation Specialist and Support Specialist III from September 2014 to August 2021 providing support for Lightspeed Retail and "all of its integrations." CW4 dealt directly with customer support issues involving inventory, customer and payment data and integrations of Lightspeed Retail. CW4 left Lightspeed due to "leadership issues internally, which is to say things weren't getting fixed," including "issues with the product and Lightspeed Retail," which management did not address.

the purpose of combatting a decline in Lightspeed's organic growth. CW4 stated that Lightspeed never integrated ShopKeep's employees into Lightspeed though stating it would do so upon the acquisition.

42. According to CW4, during the town hall meetings that took place during the first half of 2021, which CW4 attended, employees raised questions to President Chauvet and Defendant Dasilva about "severe issues affecting Lightspeed Retail and its associated products" but their only response was that the Company did not have the developer resources to fix the issues and that "we are to wait on changes coming soon," *i.e.*, acquisitions. During a June 2021 town hall meeting, Chauvet and Dasilva told employees that Lightspeed planned to move all its customers over to Vend within five years. CW4 explained that the Company needed to make acquisitions because Lightspeed Retail suffered technical and development issues that "extremely" affected customers and contributed to a decline in organic growth. CW4 provided an example where for years Lightspeed Retail miscalculated customers' average cost metric "every single time" because of an integration with QuickBooks that "didn't function correctly," and developers failed to timely fix the bug.

43. Regarding ShopKeep, CW6[9] explained that Lightspeed "just came and bought our customers and kind of threw out our product," seemingly to conceal its own decline. Lightspeed placed the ShopKeep product into "nurture mode," supporting it for customers already using it but no longer selling it to new customers. CW6 also stopped all of ShopKeep's development work. CW6 confirmed that Defendant Dasilva and President Chauvet conducted town hall meetings via Zoom suggesting that Lightspeed would combine all the software from its acquisitions into a

---

[9] CW6 worked for Lightspeed from December 2020 to June 2021 as a Software Developer following the ShopKeep acquisition.

unified experience called "Omni" but never explained any long-term vision for how this would work, leaving employees like CW6 skeptical and "distrustful of them."

44.    Moreover, as the Spruce Report revealed, and as Plaintiff's investigation confirmed, to make the acquisitions appear more successful than the reality, Defendants reported inflated revenue numbers attributable to the ShopKeep and Upserve acquisitions. Specifically, in the Q3 2020 MD&A, Lightspeed reported that:

> the increase [in software and payments revenue] was primarily due to growth in our subscription customer base including customers from the acquisitions of ShopKeep and Upserve, which combined accounted for $7.4 million of software and payments revenue in the quarter.

However, Lightspeed also stated that ShopKeep and Upserve each contributed less than 5% to Lightspeed's total revenues for Q3 2020. Lightspeed reported quarterly revenue of $57.6 million. Therefore, assuming a maximum revenue contribution of 5%, both ShopKeep and Upserve could only have generated $2.9 million at most in quarterly sales respectively, which collectively is $5.8 million---*approximately 22% less than the $7.4 million Lightspeed claimed*.

45.    On March 11, 2021 Defendants announced their next acquisition, VendLimited ("Vend"), touting the "talent and technology of Vend, widely acknowledged as providing one of the foremost retail products on the market...." The press release went on to state:

> Building on the landmark acquisition of ShopKeep, Lightspeed intends to ***leverage Vend's complementary modern technology stack and user experience capabilities to continue to deliver the most advanced commerce capabilities to retailers around the world.***

46.    However, as with the ShopKeep and Upserve acquisitions before it, Defendants misled investors regarding the true benefits of the deal.

47.    The March 11, 2021 press release, Lightspeed claimed that Vend contributed $7 billion of GTV (gross transaction volume), which it identified as a "key performance indicator." However, Vend's website indicates that it has 20,000 customer locations, with annual sales of $7

billion (NZ$ 10 billion), the same number Lightspeed quotes as Vend's GTV contribution.  Pre-acquisition, on March 1, 2021, Vend claimed to have 25,000 yet reported the same $7 billion in sales.

48.    Regarding customer locations, which Defendants identified as a "key performance indicator," Defendants stated in the March 11, 2021 press release that:

> Subsequent to the closing of the [Vend] acquisition, Lightspeed will serve as the technology partner of choice for over ***135,000*** customer locations worldwide as small and medium-sized businesses increasingly turn to the company's innovative, cloud-based platforms ahead of highly-anticipated economic reopenings in both the retail and hospitality industries." (Emphasis added.)

49.    Then, reporting on the quarter ended March 31, 2021 (20 days following the March 11, 2021 press release), during an investor conference call for the fourth quarter of 2021, held in May 2021, Defendants Dasilva and Nussey changed the number to 140,000, suggesting that Lightspeed's customer locations grew from 119,000 to 140,000 due to the Vend acquisition, though Vend could not have acquired an additional 5,000 customer locations in that brief amount of time:

> Lightspeed Payments had another record quarter and grew revenues both year-on-year and from the previous quarter. And we are now present in over ***140,000*** customer locations when we include the recent acquisition of Vend. (Emphasis added.)

On that same call Defendant Nussey stated:

> ***Looking at the building blocks of our business, everything starts with customer locations, which grew to approximately 119,000 at March 31, and is now over 140,000 on a pro forma basis, including our recent acquisition of Vend."***

### Defendants' Access to Relevant Data

50.    CWs 1, 4, 5 and 7 explained that Lightspeed used Salesforce and the business intelligence software/data analytics platform Looker to track user count, GTV, APRU, credit card processing sales, MRR (monthly recurring revenue) and other metrics.  Employees could view

metrics such as gross transaction volume in an internal system known as "RAD." Every Friday CW5 put together reports for "weekly board reviews" including reports on gross processing per week, MRR and another metric called QVR. *CW5 stated that Defendant Dasilva and President Chauvet had direct access to Salesforce and Looker, which CW5 knew "because they were always pulling reports."*

### Insider Selling During the Class Period

51.     Insider ownership has been in rapid decline post-IPO, in part from both insider-selling and stock dilution for acquisitions. At IPO insiders owned 54%, but now own just 26% on a pro forma basis. Indeed, Defendant Dasilva engaged in two unusually large transactions during the Class Period for proceeds of over $42 million. Immediately following the IPO and listing on the NYSE, Defendant Dasilva sold 238,456 shares of Lightspeed on September 15, 2020 at $30.50 a share for proceeds of $7,272,908. Then on February 12, 2021, Defendant Dasilva sold another 500,000 shares of Lightspeed for $70 a share for proceeds of $35,000,000.

### Materially False and Misleading Statements Issued During the Class Period

52.     The Class Period begins on September 10, 2020, when Lightspeed filed an amended Registration Statement (the "Amended Registration Statement") on Form F-10 after conducting the U.S. IPO. Among others, Defendants Dasilva and Nussey signed the F-10.

53.     The Company incorporated the following documents into the F-10 by reference:

    (a)    the annual information form of the Company dated May 21, 2020 for the year ended March 31, 2020 (the "Annual Information Form");

    (b)    the audited consolidated financial statements of the Company as at and for the years ended March 31, 2020 and 2019, together with the notes thereto and the independent auditor's report thereon;

    (c)    the management's discussion and analysis of financial condition and results of operations of the Company for the years ended March 31, 2020 and 2019;

(d)      the unaudited condensed interim consolidated financial statements of the Company as at June 30, 2020 and for the three-month periods ended June 30, 2020 and 2019, together with the notes thereto (the "Interim Financial Statements");

(e)      the management's discussion and analysis of financial condition and results of operations of the Company for the three-month period ended June 30, 2020 (the "Interim MD&A"); and

(f)      the management information circular of the Company dated June 26, 2020 in connection with the annual meeting of shareholders of the Company held on August 6, 2020 (the "Proxy Circular").

54.     In providing an overview of the Company, the Amended Registration Statement stated, in relevant part:

> Lightspeed provides easy-to-use, omni-channel commerce-enabling software as a service platforms. Our software platforms provide our customers with the critical functionality they need to engage with consumers, manage their operations, accept payments, and grow their business. We operate globally, empowering single- and multi-location retailers, restaurants and other SMBs to compete successfully in an omni-channel market environment by engaging with consumers across online, mobile, social, and physical channels. We believe that our platforms are essential to our customers' ability to run and grow their businesses. ***As a result, most of our revenue is recurring and we have a strong track-record of growing revenue per customer over time.***
>
> ***
>
> Our position at the point of commerce puts us in a privileged position for payment processing and allows us to collect transaction-related data insights. Lightspeed Payments, our payments processing solution, has been available to our U.S. retail customers for over one year and has recently been made available to Canadian retail customers and U.S. hospitality customers. The overall portion of new customers contracting for Lightspeed Payments alongside their core software subscription is strong at over 50% during the three-month period ended June 30, 2020, including in the recently launched Canadian retail and U.S. hospitality markets. ***We have also been seeing strong GTV penetration of Lightspeed Payments, with 10% of our U.S. retail customers' GTV being processed through Lightspeed Payments 15 months after we launched the solution. GTV penetration with our Canadian retail and U.S. hospitality customers is tracking in line with the U.S. retail segment, with 3% and 4% of GTV in those segments being processed through Lightspeed Payments three and four months after launch, respectively.*** Our targeted pricing for Lightspeed Payments is 2.60% of the electronic transaction volume processed on a gross basis, to net approximately 0.65% after accounting for

network and interchange fees and other direct processing costs. We believe that the broader rollout of Lightspeed Payments will further align us with our customers' success and represents a significant growth opportunity for our Company.

55.    Further, with respect to the Company's growth strategies, the Amended

Registration Statement stated, in relevant part:

We strive to grow our business both organically and through strategic and value-enhancing acquisitions. Key elements of our growth strategy include the following:

- ***Accelerate ARPU Expansion by Introducing New Modules***. Given our platforms' extensive suite of modules, our customers can add additional functionalities to their initial line-up of Lightspeed products as their needs evolve. We continue to see a large portion of our existing customers adopt additional modules as they grow and, increasingly, see new customers opting to purchase multiple modules at the outset when first adopting our platform. ***As of March 31, 2020, approximately 40% of our customers (excluding customers acquired through our three most recent acquisitions) are paying for more than one Lightspeed product, up from approximately 33% a year ago and 26% the year prior to that. We view this as an important measure of our ability to grow our ARPU and drive further value to our customers.***

  Our eCommerce platform has seen strong growth with an increasing number of our retail customers electing to use Lightspeed eCom to power their online selling. ***We saw the GTV processed through our eCommerce platform increase by nearly 100% in the quarter ended June 30, 2020, as compared to the same quarter a year prior.*** The overall portion of new customers contracting for Lightspeed Payments alongside their core software subscription is strong at over 50% during the three-month period ended June 30, 2020, including in the recently launched Canadian retail and U.S. hospitality markets.

  \*\*\*

- ***Strategic and Value-Enhancing Acquisitions***. We complement our organic growth strategies by taking a selective approach to acquisitions. We identify possible acquisition targets with a view to entering new verticals, accelerating our product roadmap and increasing our market penetration, thereby creating value for shareholders.

  In May 2019, we completed the acquisition of Chronogolf Inc. which enabled us to enter the attractive golf course vertical, so characterized because of its concentrated supply chains, high GTV businesses and the dominance of legacy systems. The Customer Locations attributable to this

acquisition have increased by 50% since the acquisition and revenues have grown 70% in July 2020 compared to the same month last year.

Our acquisition of ReUp Technologies Inc., a cloud-based digital loyalty solution provider, in July 2018, enabled us to, within six months thereafter, launch Lightspeed Loyalty, which was at the time one of the most requested products from our customer base. The Lightspeed Loyalty Product is now used by thousands of customers locations, driving incremental ARPU, and was recently expanded into an omni-channel loyalty solution.

Finally, our acquisition in November 2019 of Kounta Holdings Pty Ltd, a rapidly growing cloud-based POS solutions platform provider to small- and medium-sized hospitality businesses, enhanced our market penetration in Australia and New Zealand. Bringing our sophisticated go-to-market approach to this business enabled us to grow our presence in the APAC region to approximately 10,000 Customer Locations. We have begun to see module expansion in the region via analytics and delivery and have also begun to generate payments revenue through a local partnership.

Throughout our history, we have accrued significant sales and marketing expertise, which we leverage to facilitate our continued global expansion both organically and in integrating the companies we acquire.

56.    Defendants' September 10, 2020 statements regarding revenue per user/APRU, GTV, and Lightspeed's growth and acquisition strategy misled investors for the reasons described in ¶¶ 21-34 above.

57.    On November 5, 2020, Lightspeed issued a press release announcing the Company's second quarter 2021 financial results and proving an outlook for the third quarter.  The press release stated, in relevant part:

"Today, we reported one of the most exceptional quarters in the history of Lightspeed, demonstrating not only that the business model is working, but also our potential for the long-term," said Chief Financial Officer, Brandon Nussey. "The digital transformation brought on by the pandemic led to strong demand for new customer additions, growing our customer location count to over 80,000."

*** 

**Operational Highlights**

- Software and payments revenue of $41.1 million grew 62% year over year assisted by the additions of Gastrofix and Kounta which were not in the

prior year quarter. Excluding these acquisitions software and payments grew 42% year over year

\*\*\*

- ***GTV increased 56% over the same quarter last year to $8.5 billion in the quarter, and by 25% when excluding the impact of the Kounta and Gastrofix acquisitions. Retail GTV grew 34%, with the proportion going through eCommerce increasing by 80% versus the prior year. Hospitality GTV grew by 97% due mainly to the impact of the acquisitions, and also the result of a strong rebound from the lows in April***

58.     That same day, Lightspeed issued a press release entitled, "Lightspeed Acquires ShopKeep to Accelerate Digital Transformation of SMBs Across the United States."  The press release stated, in relevant part:

The acquisition immediately expands Lightspeed's U.S. market share, allowing for increased investment in sales, marketing and research and development to capitalize on the increasing demand for modern, cloud-based, omnichannel commerce solutions. Following the closing of the acquisition, ***Lightspeed will serve over 100,000 customer locations worldwide, generating approximately $33 billion USD in gross transaction volume (GTV).***

\*\*\*

***"This acquisition will bring ShopKeep merchants, small and medium-sized businesses that make up the backbone of the U.S economy, into the Lightspeed family, providing them even more crucial product innovation and world-class support as they drive the reinvention of American commerce."***

(Emphasis in original.)

59.     Defendants' November 5, 2020 statements regarding customer growth, GTV, and Lightspeed's acquisition of ShopKeep misled investors for the reasons described in ¶¶ 21-44 above.

60.     On November 8, 2020, Lightspeed hosted an earnings call with investors and analysts to discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call").  During the scripted portion of the Q2 2021 Earnings Call, Defendant Dasilva stated, in relevant part:

22

Nearly nine months after the outbreak of COVID-19, small and medium-sized businesses continue to face challenging conditions. In addition, we've experienced rapid changes in consumer behavior, necessitating a reinvention of commerce for the retail and hospitality industries. Despite these challenges, Lightspeed had one of its strongest quarters yet, with results exceeding our expectations and characterized by a *growing customer base, expanding our pool and increased adoption of our ever-growing service offering*.

***

[. . .] Lightspeed saw year-over-year GDP growth of 56% and software and payments growth of 62%, *aided by a growing customer base, increased ARPU* and the acquisitions of Kounta and Gastrofix. We had a very busy quarter with many notable initiatives.

***

Our New York listing and equity issue should help the company gain a broader investor base in the key US market, increased liquidity for all of our shareholders, raise our public profile, improve the recognition of our platform, and not least of all, allow us to continue to pursue our *growth strategy*.

*That growth strategy includes acquisitions, and I'm happy to say that our efforts to date have delivered strong success*. All four of our recent acquisitions, Chronogolf, iKentoo, Kounta and Gastrofix delivered their strongest quarters yet, demonstrating our ability to integrate and enhance the operations of our acquisition targets.

***

Finally, our proposed acquisition of ShopKeep. We are happy to announce that Lightspeed has entered into a definitive agreement to acquire one of the leading cloud commerce platform providers ShopKeep, for a total estimated consideration of approximately $440 million, ShopKeep powers over 20,000 retail and restaurant locations in the United States. *And with this acquisition firmly positioned Lightspeed as a category leader, in a highly fragmented market. The combined company will have over 100,000 customer locations globally, and approximately 33 billion in GTV.*

*ShopKeep will help bring scale and a seasoned management team to our US presence, along with a highly developed capital business, which we hope to leverage. And we will bring a broader solutions portfolio, such as Lightspeed Payments, loyalty, ecommerce, analytics, and multi-location capabilities to ShopKeep's customer base.*

23

61.    Also, during the scripted portion of the Q2 2021 Earnings Call, Defendant Nussey

stated, in relevant part:

> As a result of payments and continuing to upsell customers, new software modules *our ARPU per customer location in the quarter grew to better than $170 per month. And finally, as Dax mentioned, a recent acquisition thus thriving, giving evidence that this aspect of the strategy is working as well.*
>
> ***
>
> So recapping the second quarter in greater detail, total revenue was $45.5 million, up from $28 million a year ago, representing growth at 62%, and well above our guidance of $38 million to $40 million.
>
> ***
>
> Adjusted EBITDA loss for the quarter was $2.8 million compared to $5.1 million loss from a year ago. *And as mentioned, our GTV for the quarter was $8.5 billion. Over the past 12 months, our GTV was over $26 billion*. We ended the quarter very well capitalized with unrestricted cash on hand of approximately $513 million.

62.    Later during the Q2 2021 Earnings Call, when asked by a market analyst, "It's my

understanding is that ShopKeep struggling for growth over last couple years? First of all, can you

confirm that? And secondly, if that was the case, can you comment on that dynamic, wasn't there

missing some key capabilities that you can now offer? Or was there something else going on?",

Defendant Nussey responded, in relevant part:

> No, *the company was growing pre-COVID*, which will, you know, isolate, I suppose as we think about that - the company had a nice organic growth, very similar view to approaching the market as Lightspeed. And as JP mentioned, you know, we would see them regularly in the market and similar types of customers, similar verticals.
>
> And ShopKeep had done a nice job and that team have done a nice job of, you know, positioning multiple software offerings for those customers. And we're achieving some nice growth, again, before COVID came along.
>
> So you know, as we take a look at this, we can share very similar views and how this market will play out in the long run. *And just like all the other acquisitions, how we can bring, the increased functionality that Lightspeed offers, the increased breadth and depth of these customers. And I think we're, you know, we*

> ***really see opportunities as our joint customers now continue to grow, how they
> can leverage some of that increased functionality from Lightspeed over time.***

63.     Finally, when asked to identify the key attributes that the Company looks for when

making acquisitions, Defendant Dasilva responded, in relevant part:

> [. . .] we have three categories in which we acquire, but I think, even before we go
> into those categories, first of all, the DNA of the company needs to be like, like to
> meet, this means ***it needs to be a high growth company***, its need to be a cloud based
> system.
>
> ***
>
> The second category is really geographical expansion. So here, I think, a very good
> example would be you know, Kounta or would be Gastrofix before those two deals,
> we were - we'd have zero presence in Australia almost, and almost no presence in
> Germany.
>
> And then the third category is virtualization, which means we need to - there are a
> number of verticals where we want to go much deeper. And there I think a very
> good example is Chronogolf [ph] where we, you know, golf courses do have retail
> stores, they do have restaurants, but Chronogolf brought us set of functionality that
> enabled us to go much deeper into the golf industry.

64.     Defendants' November 8, 2020 statements regarding its growing customer base,

revenue per user/APRU, GTV, Lightspeed's growth and acquisition strategy, and the ShopKeep

acquisition specifically, misled investors for the reasons described in ¶¶ 21-44 above.

65.     On December 1, 2020, Lightspeed issued a press release entitled, "Lightspeed

Announces Acquisition of Upserve to Further Omnichannel Revolution of American Restaurant

Industry."  The press release stated, in relevant part:

> The union of Lightspeed and Upserve will ***accelerate product innovation and the
> advancement of Lightspeed's analytics-driven commerce platform***. A
> convergence of the two companies' teams and technology will provide independent
> restaurants in the United States, from fine-dine to multi-location fast-casual, one of
> the most competitive hospitality platforms on the market and enable the industry to
> more easily navigate the new dining needs made permanent by the COVID-19
> pandemic.
>
> ***

> **"*Combining forces with Upserve is a strategic next-step in Lightspeed's vision of providing the most advanced commerce platform to high-performing businesses around the world,*"** said Dax Dasilva, Founder and CEO of Lightspeed. "We believe this acquisition will **accelerate the product innovation** that has enabled Lightspeed customers to tackle the greatest challenge to their industry in decades and will add exceptional leadership to our teams in anticipation of the economic recovery of the global hospitality industry."

(Emphasis in original.)

66.    Defendants' foregoing statements regarding the Upserve acquisition were false and misleading for the reasons stated in ¶¶ 35-44.

67.    On February 4, 2021, Lightspeed issued a press release announcing the Company's third quarter 2021 financial results and providing an outlook for the fourth quarter. The press release stated, in relevant part:

> ***Software revenue increased partially due to a growing portion of Lightspeed's customer base adopting more than one software module. Additionally, payments adoption, both in terms of the number of customer locations and the proportion of GTV[] processed, continued to grow, with revenue generated through Lightspeed Payments reaching another all-time high.***

> ***

> "***Despite the challenges we continue to face as a result of the pandemic, Lightspeed was able to grow revenues, expand our customer base, deliver highly innovative new offerings and complete two transformational acquisitions***," said Chief Financial Officer, Brandon Nussey. "The value of our cloud-based, multi-channel solution is becoming more apparent as a result of the pandemic, as are solutions such as Lightspeed Payments which had another record quarter."

> **Operational Highlights**

> - Total revenues of $57.6M was up 79% year-over-year, and $49.3M when excluding the recent acquisitions of ShopKeep and Upserve representing growth of 53% year-over-year.
> - ***Software and payments revenue came in at $52.5M. Excluding ShopKeep and Upserve, software and payments revenue was $45.1M and represented 92% of total core Lightspeed revenue, up 59% year-over-year. Excluding the impact of all acquisitions that were not in the Company's results from a year ago, software and payments revenue grew by 47% as***

> *compared to the same quarter last year and versus 42% growth last quarter.*

> \*\*\*

- *Even excluding the positive impact from the ShopKeep and Upserve acquisitions Lightspeed's ARPU[] increased from the previous quarter, due predominantly to increased payments revenue in the quarter and an increased portion of customer's adopting more than one software module.*

> \*\*\*

- *Lightspeed Payments volumes grew significantly year-over-year as a growing portion of overall GTV was processed through Lightspeed Payments. Excluding the impact of ShopKeep and Upserve, approximately 15% of U.S. and 12% of Canadian Retail GTV, respectively, was processed by Lightspeed Payments in the last week of the quarter. U.S. hospitality levels remained consistent with last quarter in the last week of the quarter.*

- *Lightspeed closed two key acquisitions in the quarter, ShopKeep and Upserve. These acquisitions solidify Lightspeed as one of the leading cloud-based commerce platforms for small to medium-sized businesses in the key U.S. market.*

68.    Defendants' February 4, 2021 statements regarding its growing customer base, revenue per user/APRU, GTV, Lightspeed's growth and acquisition strategy, and the ShopKeep acquisition specifically, misled investors for the reasons described in ¶¶ 21-44 above.

69.    On February 5, 2021, Lightspeed hosted an earnings call with investors and analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call"). During the scripted portion of the Q3 2021 Earnings Call, Defendant Dasilva stated, in relevant part:

> Our team's dedication continues to pay off for our customers and investors in Q3 as Lightspeed on a year-over-year basis delivered revenue growth of 79%, relocations by 74% and expanded GTV by 48%. *Although the addition of Upserve and ShopKeep boosted our performance for the quarter, even without their contribution, Lightspeed delivered revenue ahead of our previously established guidance and reached software and payments organic revenue growth of 47% year-over-year, accelerating from the 42% we saw last quarter*.

> \*\*\*

On our M&A strategy, I want to make certain things clear. Firstly, Lightspeed looks at companies that have similar operations to our own, that is they are cloud-based, have similar go-to-market approaches and are well run. ***Because they share a similar approach and structure, integrating these companies into our operations is considerably easier.*** Given that we have some experience here, I believe we are developing an expertise in integrating acquisitions.

Secondly, I want to make clear that we have no interest in maintaining a portfolio of brands and solutions. ***The goal is to integrate all of our acquisitions and be in market with one Lightspeed solution for retail and one for hospitality, all under one Lightspeed brand. The pace at which we integrate the acquisitions will vary depending on several factors, but for ShopKeep and Upserve, the integration is well under way, with operations expected to be fully integrated by April and product by end of summer.***

Finally, our approach to M&A is to look for companies that can expand or solidify our geographic footprint, such as Gastrofix, Upserve and ShopKeep; takes us into compelling verticals such as Chronogolf; or advance our technology offering. These three goals, market expansion, vertical expansion and technology, will continue to drive our strategy going forward.

70.    Also, during the scripted portion of the Q3 2021 Earnings Call, Defendant Nussey

stated, in relevant part:

The strength of the quarter was led by the four primary drivers of our business model. First, ***continued growth of our customer base***, which, as you've have heard, is now just under 115,000 total locations at December 31. ***We saw another strong quarter of organic customer location adds, which I believe is one of the most important metrics for us.***

***Second, ARPU expansion, as we grow our customer base, our land-and-expand strategy kicks in, and we saw continued success there. ARPU for the quarter was our highest ever as more and more customers adopt a broader portion of the solution set.***

***Third, Lightspeed payments with $29 billion in overall GTV, we have a tremendous opportunity for Lightspeed payments. The number of customers' contracting for payments alongside their core subscription were an all-time high this quarter.***

***And lastly, acquisitions, we believe that smart acquisitions will accelerate our leadership position and unlock many revenue, expense and technology synergies. Our past acquisitions have proven to be highly successful, and our recent acquisitions of ShopKeep and Upserve are landmark deals that significantly alter***

28

*our scale and market presence. We believe all four of these drivers have substantial runway still ahead of us.*

\*\*\*

*Also as mentioned, overall GTV grew 48% versus the same quarter a year ago and 29% when excluding ShopKeep and Upserve. Within this, we continue to see strength from our retail customers, where overall retail GTV grew 41% versus the prior year. Retail GTV was aided by continued success of ecommerce, where GTV was up by approximately 100% versus the prior year.*

71.     Defendants' February 5, 2021 statements regarding its growing customer base, revenue per user/APRU, GTV, Lightspeed's acquisitions and integration of those acquisitions, misled investors for the reasons described in ¶¶ 21-44 above.

72.     On March 11, 2021, Lightspeed issued a press release entitled, "Lightspeed to acquire Vend to power global retail expansion."  The press release stated, in relevant part:

The acquisition also builds on Lightspeed's foothold in Asia-Pacific, approximately doubling the company's customer base and expanding its retail footprint in that region. ***The combination of Lightspeed with the talent and technology of Vend, widely acknowledged as providing one of the foremost retail products on the market, will help to further growth by ultimately providing the Vend customer base access to the company's broader commerce solutions, such as Lightspeed Payments, Lightspeed eCommerce, Lightspeed Loyalty, as well as future access to the Lightspeed Supplier Network.***

\*\*\*

"Lightspeed's mission is to ignite the potential of businesses to enrich the communities they serve, whether they are beloved local neighborhoods or the thriving metropolitan cities we are eager to see bustling with crowds once again," said Dax Dasilva, Founder and CEO of Lightspeed. "We are thrilled to partner with Vend, a team that matches Lightspeed's passion for retail. That combined drive will position our global retail base of high-performing businesses for success as they emerge from a truly transformational period in the history of modern commerce."

73.     Defendants' March 11, 2021 statements regarding the Vend acquisition, misled investors for the reasons described in ¶¶ 35-49 above.

74.     On May 20, 2021, Lightspeed issued a press release announcing the Company's fourth quarter 2021 financial results and providing an outlook for fiscal 2022.  The press release stated, in relevant part:

Fiscal 2021 ended up as one of the most transformative years yet for Lightspeed, with the Company announcing three landmark acquisitions, launching a series of new offerings such as Lightspeed Capital, eCommerce for Restaurants and Order Ahead, listing on the New York Stock Exchange and delivering innovative strategic initiatives such as Supplier Network and the recently announced integration of Google tools directly into the platform. In addition to these key strategic accomplishments and despite the ongoing challenges presented by the global COVID-19 pandemic, Lightspeed delivered strong results in the quarter and the year with small and medium-sized businesses increasingly adopting the Company's cloud-based commerce platform to enable their omnichannel strategies.

***As of March 31, 2021, Lightspeed saw GTV[] grow to $10.8 billion while achieving record revenues of $82.4 million and customer locations[] ended at over 140,000 after giving effect to the acquisition of Vend Limited ("Vend"). The Company saw excellent performance from Lightspeed Payments, with revenue from Payments reaching another all time high.*** Software revenue also pushed higher thanks to existing customers adopting a greater number of software modules and a ***growing customer base. GTV continued to grow*** despite challenges in the hospitality sector, with omnichannel retail and the Australia region showing particular strength.

"Our mission to arm entrepreneurs with the technology they need to run and scale their businesses has never felt more relevant," said Dax Dasilva, Founder and CEO of Lightspeed. "We believe our customers will look back on the past year as the time when an omnichannel presence moved to becoming an absolute necessity and on Lightspeed as the partner that helped them get there. While helping our customers meet the challenges of the past year, Lightspeed grew its scale, established itself as a leader in the key U.S. market, launched a series of new product offerings, and continued to deliver strong results."

***

**Operational Highlights**

- ***Total revenues of $82.4 million were up 127% year-over-year thanks to a combination of strong organic[] growth and the recent acquisitions of Upserve and ShopKeep, which added $31.2 million in revenue.*** Also, due to renegotiated terms with the payments partner of our recent acquisitions, Lightspeed has gained greater control of the underlying customer relationship and, as a result, is seeing superior economics. Due to this

modified relationship, **_Lightspeed realized increased revenue of approximately $7.4 million in the quarter, along with improved gross profit_**.

- In the quarter, subscription and transaction-based revenue was $75.3 million, representing 91% of all revenue and growing 137% year-over-year. **_Organic growth of 48% year-over-year and the recent acquisitions of Upserve and ShopKeep, which added $28.3 million in subscription and transaction-based revenue, accounted for the strong growth_**.

***

- **_ARPU[] increased year-over-year by 48% to $215. The bulk of this ARPU improvement came from transaction-based revenues largely due to the success of Lightspeed Payments. Software also contributed to year-over-year ARPU increases partially due to an increasing portion of customers taking on multiple modules._**

- **_For the quarter, Lightspeed delivered GTV of $10.8 billion up 76% year-over-year. Excluding our recent acquisitions, the Company continued to see strong growth in Retail with eCommerce growth of approximately 100% year-over-year and total omnichannel retail GTV growth of 65% year-over-year. Organic[]GTV growth was 25% year-over-year as hospitality continued to be challenged in the quarter._**

75.    That same day, Lightspeed filed an Annual Report on Form 40-F with the SEC, reporting the Company's financial and operating results for the year ended March 31, 2021 (the "2021 40-F"). The 2021 40-F stated, in relevant part:

> **_Evaluation of disclosure controls and procedures_**. Disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) are designed to provide reasonable assurance that information required to be disclosed in reports filed with the Securities and Exchange Commission (the "Commission") are recorded, processed, summarized and reported in a timely fashion. The disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in such reports is then accumulated and communicated to the Company's management to ensure timely decisions regarding required disclosure. Management regularly reviews disclosure controls and procedures; however, they cannot provide an absolute level of assurance because of the inherent limitations in control systems to prevent or detect all misstatements due to error or fraud. The Chief Executive Officer [] and the Chief Financial Officer [], along with management, have evaluated and concluded that the Company's disclosure controls and procedures as at March 31, 2021 were effective.

31

76.    Also, that same day, Lightspeed hosted an earnings call with investors and analysts to discuss the Company's full year and fourth quarter 2021 results (the "Q4 2021 Earnings Call"). During the scripted portion of the Q4 2021 Earnings Call, Defendant Dasilva stated, in relevant part:

> We were happy to end the year on a high note with Lightspeed delivering quarterly revenues that exceeded previously established guidance and street expectations. We grew revenue 127% year-over-year with organic software and transaction-based revenue growth of 48%. Lightspeed Payments had another record quarter and grew revenues both year-on-year and from the previous quarter. ***And we are now present in over 140,000 customer locations when we include the recent acquisition of Vend***.
>
> ***
>
> Part of the reason we are able to expand our ambitions, attract partners such as Google and invest in new technologies is our scale. ***That scale has been a result of our considerable organic growth, but also thanks to our M&A efforts. M&A has always been a part of our strategy and in the last six months that has been front and center. Over time, we should continue to recognize the benefits of our M&A strategy across our entire business, but I believe it is important to highlight that we are already seeing some of these benefits.***

77.    Also, during the scripted portion of the Q4 2021 Earnings Call, Defendant Nussey stated, in relevant part:

> The great news is that we're seeing plenty of reasons for optimism in our customer base as customers find success using our omnichannel solutions to reach their consumers. ***This shows up in our GTV, which was almost 11 billion in the quarter up 76% from a year ago. Excluding ShopKeep and Upserve's contribution, overall GTV was 7.6 billion up 25% versus a year ago. Omnichannel retail continues to perform exceptionally well for us, with GTV up 65% from a year ago organically***. Within retail, e-commerce volumes were up almost 100% from a year ago. Hospitality was down 15% year-over-year organically, but a solid resurgence in March, which continued into April.
>
> ***
>
> ***In the last month of the quarter, our overall penetration of GTV was approaching 10%, excluding Upserve and ShopKeep showing the runway we still have ahead of us.*** All of this led to overall revenue of 82.4 million up 127% from 36.3 million a year ago. For the full year, revenue was 222 million up 84% from 121 million a

year ago. ***Excluding the impact of ShopKeep and Upserve, revenue was 51.2 million in the quarter. Within our total revenue, our software and payments revenue for the quarter was 75.3 million up 137% from 31.8 million a year ago. When excluding ShopKeep and Upserve, organic software and payments revenue grew by 48%.*** And for the full-year, software and payments was 202 million up from 107 million a year ago.

78.    Defendants' May 20, 2021 statements regarding its growing customer base, organic growth, APRU, GTV, and Lightspeed's acquisitions, misled investors for the reasons described in ¶¶ 21-49 above.

79.    On August 5, 2021, Lightspeed issued a press release announcing the Company's first quarter 2022 financial results and raising its outlook for fiscal 2022.  The press release stated, in relevant part:

> ***Fiscal 2022 got off to a strong start with the Company achieving record quarterly revenue, GTV[] and Customer Locations[]. In addition to delivering strong results, the Company advanced on strategic initiatives including expanding Lightspeed Payments in the EMEA region, closing the acquisition of Vend Limited ("Vend"),*** partnering with the leading restaurant reservation platform OpenTable and announcing definitive agreements to acquire NuORDER and Ecwid — the former of which closed in July.

> ***For the quarter ended June 30, 2021, Lightspeed saw GTV grow to $16.3 billion while achieving record revenue of $115.9 million and Customer Locations of over 150,000.*** The Company's payments solutions continued to be a key driver of growth as more customers contracted for payments alongside their software subscriptions. ***Subscription revenue increased thanks partially to the recent acquisitions of ShopKeep, Upserve and Vend, but also due to an increase in Customer Locations. GTV growth was assisted by the strong rebound in the hospitality sector and the EMEA region.***

> ***

> "Lightspeed achieved outstanding results this quarter as demand for both our software and payments solutions were bolstered by economies reopening around the world" said Chief Financial and Operations Officer Brandon Nussey. "The momentum we experienced in March continued into our fiscal Q1 as our customers experienced a strong recovery which ***helped accelerate our GTV growth***."

> ***

**Operational Highlights**

- ***Total revenue of $115.9 million was up 220% year-over-year thanks to a combination of strong organic[] growth and the recent acquisitions of ShopKeep, Upserve and Vend, which added $50.5 million in revenue.***

  \*\*\*

- Subscription ***revenue of $49.9 million increased 115% year-over-year and was assisted by the recent acquisitions of ShopKeep, Upserve and Vend and the growing number of Customer Locations, which numbered over 150,000 at the end of the quarter, an increase of 95% year-over-year***. Growth was also assisted by an increased number of customers adopting multiple software modules.

- Transaction-based revenues of $56.5 million grew by a total of 453% year-over-year. ***The strong performance was a result of accelerating growth in GTV and an increasing portion of that GTV being processed through the Company's payments solutions***. Lightspeed saw an increasing number of customers contract for payments alongside their software subscriptions in the quarter. The recent acquisitions of ShopKeep, Upserve and Vend also contributed.

- ***For the quarter, Lightspeed delivered GTV of $16.3 billion up 203% year-over-year. Organic3 GTV growth was 91% year-over-year. GTV growth was greatly assisted by Hospitality that saw growth of 380%.*** Omnichannel retail also experienced strong growth at 139%, year-over-year. Approximately 10% of GTV was processed through the Company's payments solutions.

80.    That same day, Lightspeed hosted an earnings call with investors and analysts to discuss the Company's Q1 2022 results (the "Q1 2022 Earnings Call").  During the scripted portion of the Q1 2022 Earnings Call, Defendant Dasilva stated, in relevant part:

> Total revenue was up 220% year-over-year, with organic software and payments revenue up 78%. The company now maintains over 150,000 retail and hospitality locations globally. ***GTV was strong, growing 203% year-over-year to $16.3 billion. Organic GTV growth was 91%.*** Payments penetration continues to increase with approximately 10% of our GTV processed through our payment solutions.

\*\*\*

34

***We closed the acquisition of Vend in the quarter, with that group delivering better-than-expected results.*** We established a partnership with the leading restaurant reservation platform OpenTable.

81.    Also, during the scripted portion of the Q1 2022 Earnings Call, Defendant Nussey

stated, in relevant part:

***GTV was an outstanding $16.3 billion, up from $10.8 billion just last quarter. It was 203% higher than a year ago. On an organic basis GTV grew 90% from last year's depressed levels.*** We're thrilled to see our customers and the communities they serve come back to life.

\*\*\*

As mentioned, hospitality roared back to life as economies reopened. ***Organic growth in GTV was 164% in the quarter and was up 380% overall.*** This wonderful performance by our customers translated into our payments revenue performing well above our plans. Volume increases with expanding payments availability around the world and strong ongoing customer demand, led to overall transaction-based revenue growing more than 450% year-over-year. Really encouraged to see all this come together for our customers and for Lightspeed.

All told then, we reported $115.9 million of revenue, up 220% over last year and well ahead of our guidance of $90 million to $94 million. Excluding acquisitions completed in the last 12 months, revenue grew by 81%. Subscription and transaction-based revenue was 92% of our total revenue at $106.4 million and grew by 218%. On an organic basis, Software and Payments grew 78% year-over-year.

\*\*\*

We believe we are well positioned to continue increasing our market share, as the Lightspeed brand continues to gain prominence, given our best-in-class solution suite and rapid adoption of cloud-based solutions. We further believe that we will be able to grow our software ARPU, for new and existing customers, as our customers adopt more of our solution footprint and we introduce new functionality to our customers.

82.    Further, when asked a question regarding the ultimate ARPU potential for the

Company, Defendant Nussey stated, in relevant part:

[. . .] as we sit here today, we're really comfortable with the progress we're making on growing market share and ***we take a look at the rates we're growing the customer base and the size of our market, we remain really optimistic there. We've been growing and we've always said that we saw opportunity to grow***

*software ARPU at 10% a year or thereabouts.* And as we sit here today and think about the reception of our customers to incremental modules, our value prop of being a largely one-stop shop for the core offerings.

We feel very good that we're going to continue to see that play out. We've mentioned that about half of our customers use at least one Lightspeed module and half don't. So there's lots of white space there for us to continue to grow that that software ARPU in our view.

And then the rest of the ARPU comes from, of course, financial services, payments, Lightspeed Capital things of that nature. We're about 10% today. We see certainly opportunity to get to 50% in the foreseeable future. And that all told if we're successful doing that we're going to see ARPU growth consistently at a healthy clip here M&A notwithstanding.

83.     Defendants' August 5, 2021 statements regarding its growing customer base, organic growth, APRU, GTV, and Lightspeed's acquisitions, misled investors for the reasons described in ¶¶ 21-49 above.

84.     The statements referenced in ¶¶ 52-82 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lightspeed had misrepresented the strength of its business by, *inter alia*, overstating its customer count, GTV, and increase in ARPU, while concealing the Company's declining organic growth and business deterioration; (ii) Lightspeed had overstated the benefits and value of the Company's various acquisitions; (iii) accordingly, the Company had overstated its financial position and prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

85.     On September 29, 2021, market analyst Spruce Point Capital Management published a report regarding Lightspeed and issued a press release summarizing its

findings. Specifically, the report indicated that "evidence shows lightspeed massively inflated its business pre-IPO," stating, in relevant part:

- We find irrefutable evidence that LSPD overstated its customer count by 85%, while GTV, a measure of payment volume through its platform was overstated by at least 10%. Using the Wayback Machine to scrape customer and GTV counts suggests that LSPD's business was already stalling pre-IPO. LSPD has shifted its discussion from customers to locations:
  - ➢ GTV overstatement identified as early as 2014 and revisions were made pre-IPO, reducing it by ~$1.5 billion. A former employee told us to be careful of GTV as a metric, and that it is "smoke and mirrors"
  - ➢ Customer overstatement from 50k to 27k verified by two methods, using GTV per customer and ARPU per customer
- At its IPO, LSPD's prospectus promoted a Total Addressable Market (TAM) of $113bn to grow to $542bn:
  - ➢ Yet, after $2.5bn spent on acquisitions since its IPO, its recent prospectus showed a current TAM of just $16 billion (85% less)
- A compensation clawback policy was formally adopted at IPO for material misstatement of financials

86.    Further, the report indicated that there is "evidence of slowing (and declining) organic growth and business deterioration through [the] IPO," stating, in relevant part:

- Hardware margins have recently turned negative and deferred revenue quality has deteriorated. Hardware sales, formerly a profit center, is now a cost center as competition gives it away for free. LSPD used to get upfront payments from customers for long-term contracts and reported long-term deferred revenue. Now, it charges monthly payments and long-term deferred revenue is declining. A former employee told us definitively LSPD's ARPU has been declining, but management claims it is growing
- LSPD initially told investors that operating cash flow was the best way to measure its growth. However, it quickly suspended its cash flow guidance and didn't promptly call out the change to investors
- LSPD's income statement disclosures make it difficult to determine organic growth. However, balance sheet allocation from recent acquisitions gives us some insights:
  - ➢ In Q3 2021, LSPD shifted towards larger acquisitions: ShopKeep ($545m), Upserve ($412m), and Vend ($372m). By backing out each acquisition's contributions to deferred revenue and receivables, we find evidence of double digit organic decline. This contrasts with LSPD's claims of 42% organic software and payments revenue growth in its core business[.]

87.    In addition, the report stated that Lightspeed was "pivot[ing] to acquisitions and wildly overpay[ing] when growth stalls," stating, in relevant part:

- [. . .] recent deals have come at escalating costs, and with little clear path to profitability. A few glaring issues surface:
  - ➢ LSPD has said it won't buy old platforms, but that's exactly what we believe it's done:
    - ○ Example: ShopKeep was near bankruptcy and had limited growth, Upserve's business was in decline, and Vend was falling severely short of its financial expectations
  - ➢ LSPD's ARPU has been bizarrely stable and growing while most acquisitions have come in at lower ARPUs
  - ➢ GTV and customer numbers simply aren't adding up with the recent acquisition of Vend for $372m. We estimate Vend either overstated transacting customers by 25% or reported customers that didn't exist
  - ➢ Speaking with former employees, we find evidence that not all acquisitions have gone smoothly or met internal expectations, while some acquired platforms have been sunsetted
    - ○ Yet, LSPD has never taken a goodwill or intangible asset impairment, and recently changed its goodwill testing criteria to make it more liberal. There is a likelihood these changes were made to avoid impairments[.]

88.    The report also suggested that there was evidence of aggressive revenue reporting, stating, in relevant part:

- LSPD appears to have loosened its revenue recognition disclosure post IPO to allow for earlier recognition. There is evidence of a revenue restatement post IPO (along with COGS revisions), without explanation
- Revenues barely went down during the peak COVID-19 shutdowns, while other peers with retail and hospitality POS businesses saw revenues decline by 20% and DSOs worsen:
  - ➢ LSPD's reported DSOs actually improved during this period
- The Company changed its story a year later about customers adding modules in early 2020, to now say in 2021 that customers who cut modules are coming back[.]

89.    Finally. with respect to Lightspeed Payments, the report indicated that there was trouble with this "highly promoted upside opportunity," stating, in relevant part:

- LSPD promoted a "payments" solution in 2014, which to the best of our knowledge, didn't appear to gain much traction. Now post-IPO in early

2019, LSPD introduced a new "Lightspeed Payments" and has been heavily promoting its upside to investors

- LSPD has been dodgy about providing any KPIs around the payments solution

*\*\**

- In its recent Annual Report, LSPD finally provided details on "transaction-based" revenues and costs, thereby allowing investors to see how the business is progressing:
  ➢ Spruce Point believes LSPD purposefully avoids talking about payments margins. Even when asked directly by analysts, management gives long-winded answers in response
  ➢ What's evident is that transaction-based margins are falling hard and have compressed by ~2,500bps since March 2020. Management hasn't been exactly open with investors about the magnitude or reasons for the sharp decline[.]

90. On this news, Lightspeed's stock price fell $13.73 per share, or 12.2%, to close at $98.77 per share on September 29, 2021.

91. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

92. Ben Axler, the author of the Spruce Report, is the Founder and Chief Investment Officer of Spruce. Mr. Axler specializes in activist short-selling, forensic financial research, and has exposed over $1.0 billion of alleged listed frauds on Nasdaq and the NYSE. Prior to founding his company in 2009, Mr. Axler spent eight years as an investment banker with Credit Suisse and Barclays Capital where he structured and executed billions of dollars of financing, derivative risk management, and M&A deals for leading Fortune 500 clients. Mr. Axler is a contributing writer to Seeking Alpha, has been profiled in Barrons, and in the book "The Happiness Advantage: The Seven Principles of Positive Psychology That Fuel Success and Performance at Work." Mr. Axler's short research has been profiled by the National Bureau of Economic Research (NBER) in an

analysis entitled "How Constraining Are Limits to Arbitrage? Evidence from a Recent Financial Innovation," and shown to produce superior investment returns. In addition, according to a research study from Sumzero analyzing 12,000 analyst recommendations since 2009, Mr. Axler ranked #1 globally for idea performance. A recent analysis by Sentieo ranked Mr. Axler's @sprucepointcap profile the 13th most influential financial blogger on Twitter. Mr. Axler graduated from Yale University with a masters degree in Statistics, and received both a Bachelor of Arts degree in Statistics and a Bachelor of Science in Marketing and Business Administration from Rutgers College, where he graduated with Summa Cum Laude and Phi Beta Kappa honors.

93.    The Spruce Report makes clear that:

> To the best of our ability and belief, as of the date hereof, all information contained herein is accurate and reliable and does not omit to state material facts necessary to make the statements herein not misleading, and all information has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer, or to any other person or entity that was breached by the transmission of information to Spruce Point Capital Management LLC.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

94.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lightspeed securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

95.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lightspeed securities were actively traded on the

NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lightspeed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

98.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lightspeed;

- whether the Individual Defendants caused Lightspeed to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lightspeed securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

100.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lightspeed securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Lightspeed securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

101.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

102.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

103.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

104.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

105.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lightspeed securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lightspeed securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

106.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lightspeed securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lightspeed's finances and business prospects.

107.    By virtue of their positions at Lightspeed, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

108.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Lightspeed, the Individual Defendants had knowledge of the details of Lightspeed's internal affairs.

109.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lightspeed. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lightspeed's

businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lightspeed securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Lightspeed's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Lightspeed securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

110.    During the Class Period, Lightspeed securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lightspeed securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Lightspeed securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Lightspeed securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

111.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

112.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

113.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

114.    During the Class Period, the Individual Defendants participated in the operation and management of Lightspeed, and conducted and participated, directly and indirectly, in the conduct of Lightspeed's business affairs.  Because of their senior positions, they knew the adverse non-public information about Lightspeed's misstatement of income and expenses and false financial statements.

115.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lightspeed's financial condition and results of operations, and to correct promptly any public statements issued by Lightspeed which had become materially false or misleading.

116.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lightspeed disseminated in the marketplace during the Class Period concerning Lightspeed's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lightspeed to engage in the wrongful acts

complained of herein. The Individual Defendants, therefore, were "controlling persons" of Lightspeed within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lightspeed securities.

117. Each of the Individual Defendants, therefore, acted as a controlling person of Lightspeed. By reason of their senior management positions and/or being directors of Lightspeed, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lightspeed to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Lightspeed and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

118. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lightspeed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 27, 2022                            Respectfully submitted,

                                                 POMERANTZ LLP

                                                 */s/ Tamar A. Weinrib*
                                                 Tamar A. Weinrib
                                                 Jeremy A. Lieberman
                                                 600 Third Avenue
                                                 New York, New York 10016
                                                 Telephone: (212) 661-1100
                                                 Facsimile: (212) 661-8665
                                                 taweinrib@pomlaw.com
                                                 jalieberman@pomlaw.com

                                                 *Attorneys for Plaintiff*