UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KISHORE NATH, Individually and On
Behalf of All Others Similarly Situated,

                      Plaintiff

                      v.

LIGHTSPEED COMMERCE INC.,
DAX DASILVA, and BRANDON BLAIR
NUSSEY,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     :    Case No. 1:21-cv-06365-BMC
     :
     :
     :    ECF Case
     :    Electronically Filed
     :
     :    Oral Argument Requested

# DEFENDANTS' MEMORANDUM OF LAW
# IN SUPPORT OF THEIR MOTION TO DISMISS
# <u>THE AMENDED CLASS ACTION COMPLAINT</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Alexander C. Drylewski
William J. O'Brien
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
alexander.drylewski@skadden.com
william.obrien@skadden.com

*Counsel for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. III

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 7

    A.    Defendants ............................................................................................................ 7

    B.    Lightspeed's Business Model ............................................................................... 7

        1.    Subscription Revenue ............................................................................... 7

        2.    Transaction-Based Revenue ..................................................................... 8

    C.    Lightspeed Discloses Adjustments to Its Key Performance Indicators ............... 9

        1.    Disclosures Concerning Customer Location ............................................ 9

        2.    Disclosures Concerning GTV ................................................................... 9

        3.    Disclosures Concerning ARPU ................................................................ 9

    D.    Lightspeed Continues To Grow Its Business While Pursuing Strategic
        Acquisitions ....................................................................................................... 10

    E.    Spruce Point Publishes the Short Report and Plaintiffs Reflexively File
        Suit .................................................................................................................... 11

ARGUMENT .......................................................................................................................... 12

I.    THE CAC SHOULD BE DISMISSED WITH PREJUDICE .......................................... 12

    A.    Plaintiffs Fail To Plead Any Misstatements Regarding Lightspeed's Key
        Performance Indicators ...................................................................................... 12

        1.    Plaintiffs Do Not Plead Any Misstatements Concerning GTV ............... 12

        2.    Plaintiffs Do Not Plead Any Misstatements Concerning Customer
            Counts ..................................................................................................... 15

        3.    Plaintiffs Do Not Plead Any Misstatements Concerning Customer
            Locations ................................................................................................. 16

4.      Plaintiffs Do Not Plead Any Misstatements Concerning ARPU .............17

5.      Plaintiffs Do Not Plead Any Misstatements Concerning TAM...............18

B.      Plaintiffs Do Not Plead Any Misstatements
Concerning Organic Revenue Growth............................................................20

1.      Statements Concerning Organic Revenue Growth for Q3 FY21.............20

2.      Statements Concerning Organic Revenue Growth for Q1 FY22.............22

C.      Plaintiffs Do Not Plead Any Misstatements Concerning Acquisitions ................23

1.      Plaintiffs Fail to Plead Falsity as to Any Acquisition Statement.............24

2.      Many Acquisition Statements Are Protected
by the PSLRA Safe Harbor and Bespeaks Caution Doctrine ...................26

3.      Many Acquisition Statements Are Protected Opinions...........................28

D.      Plaintiffs Fail To Plead a Strong Inference of Scienter ......................................30

1.      Plaintiffs Fail To Plead a Cognizable Motive........................................30

2.      Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness ...........32

3.      The More Cogent and Compelling Inference Is Nonculpable .................34

II.      PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON
LIABILITY ..................................................................................................34

CONCLUSION...........................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abely v. Aeterna Zentaris Inc.*,
   2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...................................................................31

*Abramson v. NewLink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020)...........................................................................................24

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995).......................................................................................... 30, 31

*In re Adient plc Securities Litigation*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)....................................................................33

*In re Alkermes Public Ltd. Co. Securities Litigation*,
   523 F. Supp. 3d 283 (E.D.N.Y. 2021) .........................................................................32

*Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022).......................................................... 28, 30, 31, 32

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...........................................................................................7

*Boca Raton Firefighters & Police Pension Fund v. Bahash*, ...................................................26
      506 F. App'x 32 (2d Cir. 2012)

*Brady v. Top Ships Inc.*,
   2019 WL 3553999 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom.*
   *Onel v. Top Ships, Inc.*, 806 F. App'x 64 (2d Cir. 2020)..................................... 6, 13, 17

*Building Trades Pension Fund of Western Pennsylvania v. Insperity, Inc.*,
   2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .............................................. 19, 24, 27, 30

*Canez v. Intelligent Systems Corp.*,
   2021 WL 3667012 (E.D.N.Y. Aug. 18, 2021).......................................................... 32, 33

*Chapman v. Mueller Water Products, Inc.*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020) .................................................................... 31, 32

*Chen v. X Financial*,
   2022 WL 765417 (E.D.N.Y. Mar. 13, 2022)...............................................................34

iii

*City of North Miami Beach Police Officers' & Firefighters' Retirement Plan v. National*
   *General Holdings Corp.*,
   2021 WL 212337 (S.D.N.Y. Jan. 21, 2021),
   *aff'd sub nom. Town of Davie Police Officers' Retirement System. v. City of North*
   *Miami Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 5142702 (2d
   Cir. Nov. 5, 2021) ....................................................................................... 6, 30, 32

*In re Curaleaf Holdings, Inc. Securities Litigation*,
   519 F. Supp. 3d 99 (E.D.N.Y. 2021) ..........................................12, 15, 17, 25, 28

*In re Diebold Nixdorf, Inc. Securities Litigation*,
   2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ........................................................ 19, 24

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................................30

*Emerson v. Mutual Fund Series Trust*,
   393 F. Supp. 3d 220 (E.D.N.Y. 2019) ..............................................................17

*In re FedEx Corp. Securities Litigation*,
   517 F. Supp. 3d 216 (S.D.N.Y. 2021) ..............................................................27

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes*
   *Invest v. United Tech. Corp.*, 779 F. App'x 69 (2d Cir. 2019) ..................................32, 33

*Friedman v. Endo International PLC*,
   2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ..............................................5, 25, 26, 29, 30

*In re Garrett Motion Inc. Securities Litigation*,
   2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) ..............................................................12

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..................................................................30, 31

*Harris v. AmTrust Financial Services, Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)...............2, 24

*Holbrook v. Trivago N.V.*,
   2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago*
   *N.V.*, 796 F. App'x 31 (2d Cir. 2019)..................................................................34

*In re Iconix Brand Group, Inc.*,
   2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ..............................................30, 31, 34

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020).................................................................................34

*Lachman v. Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) ....................................................................... 6, 34

*In re Lehman Bros. Securities & Erisa Litigation*,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) ................................................................. 14

*In re Lions Gate Entertainment Corp. Securities Litigation*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ................................................................................ 13

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) ................................................................. 1, 14, 17

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018)....................................................................................... 28

*In re Micro Focus International Plc Securities Litigation*,
    2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020)...........................................5, 24, 25, 26, 28

*In re Nokia Corp. Securities Litigation*,
    2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ................................................................. 13

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) ................................................................... 17-18, 28

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013) .......................................................................... 4, 23

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S 175 (2015). ........................................................................................ 19, 28, 29

*In re Philip Morris International Securities Litigation*,
    437 F. Supp. 3d 329 (S.D.N.Y. 2020) ............................................................................. 27

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................................... 25, 27

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*,
    339 F. Supp. 3d 169 (S.D.N.Y. 2018) ............................................................................. 20

*Saltz v. First Frontier, L.P.*,
    485 F. App.'x 461 (2d Cir. 2012) .................................................................................... 12

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ....................................................................... 14, 20

*In re Skechers USA, Inc. Securities Litigation*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020) ............................................................................. 31

*In re SunEdison, Inc. Securities Litigation*,
  300 F. Supp. 3d 444 (S.D.N.Y. 2018) ........................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................... 3, 5, 7, 34

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).......................................................................28

*Tung v. Bristol-Myers Squibb Co.*,
  2020 WL 5849220 (S.D.N.Y. Sept. 30, 2020), *aff'd sub nom. Arkansas Public
  Employees Retirement System v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir.
  2022) ........................................................................................................31

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) ....................................................29, 33

*Wyche v. Advanced Drainage Systems, Inc.*,
  2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) .................................................31

*In re XP Inc. Securities Litigation*,
  524 F. Supp. 3d 23 (E.D.N.Y. 2021) ..........................................................22

## STATUTES

15 U.S.C. § 78u-4(b) ..............................................................................................3

15 U.S.C. § 78u-5(c) .............................................................................................27

Defendants Lightspeed Commerce, Inc. ("Lightspeed" or the "Company"), Dax Dasilva, and Brandon Blair Nussey (the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint ("CAC") of Lead Plaintiffs Debrob Investments Limited and Kishore Nath ("Plaintiffs") (CAC, ECF No. 33).

## PRELIMINARY STATEMENT

This case marks the continuation of an unfortunate trend in securities litigation: private plaintiffs, rather than investigating and developing claims on their own, ride the coattails of reports issued by institutional short-sellers—firms whose very business model revolves around "speculating that the price of a security will decrease" and "have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020). On September 29, 2021, one such short-seller called Spruce Point Capital Management ("Spruce Point") issued a report (the "Short Report") attacking Lightspeed's business through a series of biased and highly misleading claims (Ex. A).[1] In doing so, Spruce Point admitted that it held a "short position" in Lightspeed stock and therefore stood to "realize significant gains in the event that the price declines." (*Id.* at 2.)[2] Through this action, Plaintiffs opportunistically seek to capitalize on the Short Report and subsequent decline in Lightspeed's stock price by claiming in conclusory fashion that "fraud" must have occurred. As detailed below, however, the only misleading statements in this case are those found in the Short Report—and by

---

[1] All referenced exhibits are appended to the Declaration of Alexander C. Drylewski, dated June 27, 2022, and are referred to herein as "Ex. __."

[2] As recently reported, the U.S. Department of Justice and Securities and Exchange Commission have commenced inquiries into short-seller firms—including Spruce Point—for potential trading abuses. *See* "Vast DOJ Probe Looks at Almost 30 Short-Selling Firms and Allies," available at: https://www.bloomberg.com/news/articles/2022-02-04/vast-doj-probe-looks-at-almost-30-short-selling-firms-and-allies?sref=GUP2BhaG.

extension the CAC, which merely parrots the Short Report's faulty assertions and, in some instances, amplifies them.

Founded in 2005, Canadian-based Lightspeed provides "commerce-enabling software-as-a-service platforms" to small and midsized businesses around the world. (Ex. B at 2.) Lightspeed became a public company in March 2019, when it conducted an initial public offering on the Toronto Stock Exchange (the "Canadian IPO"). (CAC ¶ 3.) Eighteen months later, on September 9, 2020, Lightspeed listed its Subordinate Voting Shares for trading on the New York Stock Exchange (the "U.S. IPO"). (*Id.*) Contrary to Spruce Point's distorted narrative, Lightspeed's business thereafter experienced dramatic growth, recording double-digit organic revenue growth and triple-digit overall revenue growth on a year-over-year basis for the six month period ending September 30, 2021. (Ex. C at 4.)

On September 29, 2021, Spruce Point issued the Short Report—a misleading attack on Lightspeed's business based on anonymous "sources," faulty assumptions, innuendo, and bad math. Rather than independently corroborate Spruce Point's flawed claims, Plaintiffs filed the CAC, piggybacking on the Short Report and asserting claims for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Specifically, Plaintiffs allege that during the putative Class Period (September 11, 2020 through September 28, 2021), Defendants misled investors by (i) "overstating" certain of the Company's "Key Performance Indicators"; (ii) "concealing the Company's declining organic [revenue] growth"; and (iii) misrepresenting "the benefits and value of the Company's various acquisitions." (CAC ¶ 4.)

Plaintiffs' claims, however, are "long on sound, fury and speculation . . . [and] short on specifics." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). This failure compels dismissal—for unlike short-sellers, securities

2

fraud plaintiffs must meet the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The PSLRA was enacted by Congress to curb speculative lawsuits such as this, which "can be employed abusively to impose substantial costs on companies and individuals." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The CAC falls far short of the PSLRA's demanding standards and thus should be dismissed for the following separate and independent reasons:

**Failure to Plead Any False or Misleading Statements (Point I(A), *infra*).**

As an initial matter, the CAC fails to plead with particularity that any Defendant made a materially false or misleading statement, as it must. *See* 15 U.S.C. § 78u-4(b).

Key Performance Indicators. Plaintiffs' lead theory is that Lightspeed misstated certain "Key Performance Indicators." These claims, which are devoid of any supporting allegations, suffer from one or more fatal defects, including:

- **Relying on Pre-Class Period Statements:** Many of Plaintiffs' claims improperly relate to statements made well before the alleged Class Period, and in some instances, many *years* before Lightspeed was even a public company. For example, Plaintiffs contend that Lightspeed "massively overstated" its Gross Transaction Volume ("GTV"). (CAC ¶ 22.) But Plaintiffs do not plead a single purported misstatement regarding GTV during the Class Period; as a result, their claim fails as a matter of settled law.

- **Claims Based on Readily Disclosed Information:** Plaintiffs also claim that Defendants concealed information that was in fact openly disclosed. For example, they allege that Lightspeed misled investors by "quietly alter[ing] its definition of [Average Revenue Per User (or "ARPU")]" on three occasions. (CAC ¶ 33.) But as Plaintiffs must admit, each of these changes was fully disclosed to investors in the Company's public financial reports. As another example, Plaintiffs claim that Lightspeed's GTV metric was a misleading "PR number" because "[Lightspeed] could report GTV equal to the 'entire transaction' with customers, 'not what [the Company was] making on the transaction.'" (CAC ¶ 23-24.) But again, the Company publicly explained that GTV represents "the total dollar value of transactions processed" and "*does not* represent revenue earned by us." (*See* Point I(A)(1), *infra*.) [3]

---

[3] All emphasis is added unless otherwise indicated.

3

- **Claims Based on Factual Errors:** Many of Plaintiffs' other contentions badly mischaracterize the relevant disclosures. A telling example is the CAC's allegation that Lightspeed falsely reported in its Canadian IPO Prospectus (an irrelevant, pre-Class Period statement) that it had 47,000 customers, when in fact the real number was 27,000. (CAC ¶ 30.) But a review of the actual disclosure reveals that Lightspeed was discussing 47,000 *Customer Locations*, not unique customers—which are distinct numbers, since "[a] single unique customer can have multiple Customer Location," as the Company explained. (*See* Point I(A)(3), *infra.*) There is no claim that this figure— i.e., the one that Lightspeed actually disclosed—was in any way false or misleading.

Organic Revenue Growth. Plaintiffs also assert that Lightspeed concealed a purported decline in "organic revenue growth" over two quarters—Q3 Fiscal Year ("FY") 2021 and Q1 FY 2022. (*See* Point I(B), *infra.*)[4] In support, Plaintiffs reproduce charts from the Short Report that are highly misleading because they focus on only two metrics (deferred revenue and trade receivables), which Plaintiffs incorrectly equate with Lightspeed's "organic revenue growth." But this assumption is baseless: Lightspeed's overall revenue increased exponentially during the periods in question due to an increased emphasis on *transaction-based revenue*, which was fully disclosed to investors at the time. Significantly, transaction-based revenue does not generate deferred revenue or trade receivables, and thus its growth would not have been captured by Plaintiffs' cherry-picked data. Such strained, "apples to oranges" comparisons cannot support liability. *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 496-97 (S.D.N.Y. 2013).

Lightspeed's Acquisitions. Finally, Plaintiffs assert that Lightspeed misleadingly described the potential benefits of (and its plans for) three acquisitions—ShopKeep, Upserve, and Vend. (*See* Point I(C), *infra.*) To start, many of the challenged disclosures represent (i) non-actionable

---

[4] Lightspeed issues financial reports pursuant to a fiscal calendar year that begins on April 1. For example, Q3 FY21 is the period ending December 31, 2020. The accompanying Declaration denotes the corresponding calendar year period for each reporting period.

expressions of optimism; (ii) protected opinions; and/or (iii) forward-looking statements accompanied by extensive risk disclosures and cautionary language. And even if Plaintiffs could maneuver around all three doctrines (they cannot), there is no well-pled allegation that Defendants' "statements were not genuinely and reasonably believed when made." *In re Micro Focus Int'l Plc Sec. Litig.*, 2020 WL 5817275, at \*6 (S.D.N.Y. Sept. 29, 2020). This conclusion is not undercut by the grab-bag of conclusory statements by Plaintiffs' anonymous "Confidential Witnesses" ("CWs")—generalized statements which, at best, represent non-actionable and after-the-fact disagreements over business strategy. *Friedman v. Endo Int'l PLC*, 2018 WL 446189, at \*7 (S.D.N.Y. Jan. 16, 2018) (operational criticisms "are not actionable under the securities laws").

**<u>Failure To Plead a Strong Inference of Scienter (Point I(D), *infra*)</u>.**

Plaintiffs' claims independently fail because they do not allege particularized facts giving rise to a "strong inference" of scienter—i.e., an inference that is "cogent and at least as compelling as any opposing inference [of fraud]." *Tellabs*, 551 U.S. at 324. First, the CAC contains no allegations that any Defendant (much less all of them) had a "motive and opportunity" to commit fraud. (*See* Point I(D)(1), *infra*.) While Plaintiffs allege that Defendant Dasilva engaged in two stock sales during the Class Period (CAC ¶ 51), this bare allegation is insufficient because it fails to mention that Dasilva (i) sold only a small fraction of his holdings (5.1%) while retaining significant holdings throughout the Class Period; and (ii) sold more stock in percentage terms during earlier periods. The CAC does not allege that Defendant Nussey or any other Lightspeed official engaged in unusual sales during the Class Period. These factors, individually or in combination, weigh strongly against scienter.

Nor do Plaintiffs demonstrate that Defendants acted with "conscious misbehavior or recklessness." (*See* Point I(D)(2), *infra*). Plaintiffs plead no facts indicating that any Individual

Defendant had access to a single internal report, email, oral communication, or document that contradicted Lightspeed's disclosures during the Class Period. Instead, Plaintiffs rely on a hodge-podge of generalized CW statements, such as vaguely characterizing the Company's activities as "smoke and mirrors" (*e.g.*, CAC ¶¶ 23, 40), and claiming that Dasilva and President Chauvet (who is not named as a defendant) were "always pulling reports" from two "software/data analytics platform[s]" (*id.* ¶ 50). These generic allegations are "insufficient to raise an inference of scienter." *City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at \*10 (S.D.N.Y. Jan. 21, 2021), *aff'd sub nom. Town of Davie Police Officers' Ret. Sys. v. City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 5142702 (2d Cir. Nov. 5, 2021).

Juxtaposed against these non-specific allegations are Defendants' own repeated disclosures, which specifically described each of the Key Performance Indicators that Plaintiffs now claim were concealed, all while warning investors of the numerous risks associated with Lightspeed's acquisition strategy. "This steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors." *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 138 (E.D.N.Y. 2020); *Brady v. Top Ships Inc.*, 2019 WL 3553999, at \*8 (E.D.N.Y. Aug. 5, 2019) (Cogan, J.) (rejecting securities fraud claim where "[e]very term in each transaction that they challenge in the complaint was disclosed to them"), *aff'd sub nom. Onel v. Top Ships, Inc.*, 806 F. App'x 64 (2d Cir. 2020).

**STATEMENT OF FACTS[5]**

**A.     Defendants**

Lightspeed is a Canadian company whose shares trade on both the Toronto Stock Exchange and the New York Stock Exchange ("NYSE"). (CAC ¶ 3.) During the Class Period, Dasilva served as both Lightspeed's Chief Executive Officer and as a Director, while Nussey served as the Company's Chief Financial Officer. (*Id.* ¶¶ 14-15.)

**B.     Lightspeed's Business Model**

Lightspeed generates revenue primarily from (i) the sale of subscriptions that provide businesses with access to its suite of software products ("subscription revenue"); and (ii) processing and transaction fees generated by its payment services ("transaction-based revenue").[6] (Ex. B at 3.) Lightspeed reported both subscription and transaction-based revenue together as "software and payments revenue" for a portion of the Class Period (*compare* CAC ¶ 67 with ¶ 74), before beginning to report them separately in Q4 FY21 as transaction-based revenue grew significantly as a percentage of Lightspeed's overall revenue. (Ex. D at 2.)

**1.     Subscription Revenue**

Lightspeed generates subscription revenue by selling either monthly, yearly, or multi-year plans to access its software. (Ex. E at 10.) If customers with longer subscription plans elect to "pay their full contract upfront, a deferred revenue balance is created," meaning that Lightspeed records

---

[5] The facts are drawn from the CAC and "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. The Court may consider any "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[6] Lightspeed also generates a small proportion of its revenue from the sale of hardware and other services that support and supplement its subscription and transaction-based services. (Ex. B at 4.)

the revenue as a liability on its balance sheet until the service is rendered. (*Id*.) Throughout the Class Period, Lightspeed disclosed that it "ha[d] become more accommodating of monthly payment plans for [its] customers" to encourage them to adopt Lightspeed Payments, the Company's proprietary payment processing product. (*E.g.*, *id.* at 4.) Due to this decline in prepayments, Lightspeed reported a decrease in *deferred revenue* for several quarters in the Class Period. (*See id.* at 19; Ex. F at 23; Ex. B at 22.) Subscription revenue also generates trade receivables, an asset on the balance sheet that reflects services already rendered for which customers have yet to pay.

### 2.    Transaction-Based Revenue

Lightspeed separately generates transaction-based revenue by charging processing and transaction fees from the use of Lightspeed Payments, as well as from revenue sharing agreements it has with integrated payment partners. (Ex. B at 12.) Because Lightspeed deducts processing and transaction fees on each transaction processed through these payment technologies, there are no deferred revenue or trade receivables components to transaction-based revenue.

Launched in January 2019, Lightspeed Payments allows businesses to "accept electronic payments-in store, through connected terminals and online." (Ex. E at 10.) Lightspeed disclosed not only that the product would "become an increasingly important part of [its] business as [it was] ma[de] . . . available to [its] broader customer base . . . across multiple geographies," but also that it would comprise "an increasing proportion of [its] revenue." (Ex. G at 15.) As of December 31, 2020 (Q3 FY21), revenue attributable to Lightspeed Payments was "gr[owing] significantly year-over-year." (Ex. H at 2.)  In fact, by March 31, 2021, overall transaction-based revenue, driven largely by Lightspeed Payments, had increased 195% for the fiscal year. (Ex. D at 2.)

## C.    Lightspeed Discloses Adjustments to Its Key Performance Indicators

Lightspeed tracks and reports certain Key Performance Indicators for its business, including Customer Location, GTV and ARPU. (Ex. B at 5.)  Each of these indicators was specifically disclosed and defined throughout the Class Period.

### 1.    Disclosures Concerning Customer Location

Lightspeed defines Customer Location as "a billing customer location for which the term of services ha[s] not ended, or with which we are negotiating a renewal contract." (Ex. I at 4).[7] As the Company explained, a Customer Location is different than a unique customer because "[a] single unique customer can have *multiple* Customer Locations including physical and eCommerce sites." (*Id.*) Thus, Lightspeed believes Customer Location is a more meaningful "indicator of [its] success in terms of market penetration and growth of [its] business." (*Id.*) The definition of Customer Location has not changed during the Class Period.

### 2.    Disclosures Concerning GTV

Lightspeed defines GTV as "the total dollar value of transactions processed through [its] cloud-based SaaS platforms in the period, net of refunds, inclusive of shipping and handling, duty and value-added taxes." (*Id.* at 5.) Because GTV tracks the volume of transactions processed by Lightspeed's customers, it "does not represent revenue earned by [Lightspeed]." (*Id.*) The definition of GTV has not changed during the Class Period.

### 3.    Disclosures Concerning ARPU

Before its U.S. IPO, Lightspeed defined ARPU in its Canadian filings as "total software and payments revenue of the Company in the period divided by the number of *unique customers* of the Company in the period." (CAC ¶ 33.) In its Amended Registration Statement of September

---

[7] Lightspeed's Q1 FY21 6-K is incorporated by reference into its Amended Registration Statement. (Ex. J at 2.)

10, 2020, Lightspeed refined its definition of ARPU to include computations based on both average revenue per each unique customer and average revenue per each Customer Location. (Ex. I at 4.) Accordingly, Lightspeed disclosed an ARPU figure based on both unique customers and on Customer Locations, with the latter metric being more informative since "a single unique customer c[ould] have multiple Customer Locations…." (*Id.* at 3-4.)

In its first financial quarter after the U.S. IPO, Lightspeed disclosed that its definition of ARPU would be based only on the number of Customer Locations, and dropped the version of the metric based on the number of unique customers. (CAC ¶ 33.) Throughout the remainder of the Class Period, the definition of ARPU remained substantively the same.[8]

**D.     Lightspeed Continues To Grow Its Business While Pursuing Strategic Acquisitions**

Lightspeed "strive[s] to grow [its] business both organically and through strategic and value-enhancing acquisitions." (CAC ¶ 55.) In late 2020 and early 2021, Lightspeed made a series of strategic acquisitions while continuing to grow its business organically. For example, Lightspeed acquired ShopKeep, a "leading cloud commerce platform provider for both retail and hospitality." (Ex. B at 3; *see also* CAC ¶ 67.) With "over 20,000 retail and restaurant locations" in the U.S., ShopKeep "immediately expand[ed] Lightspeed's U.S. market share." (CAC ¶¶ 60, 58.) Lightspeed announced that it "hope[d] to leverage" ShopKeep's "scale and seasoned management team" in the U.S., as well as its "highly developed capital business." (*Id.* ¶ 60.) Lightspeed also acquired Upserve, a "leading restaurant management cloud software company." (Ex. B at 3; *see also* CAC ¶ 67.) Based in the U.S., Upserve "solidi[fied] Lightspeed as one of the leading cloud-based commerce platforms for [small and medium sized businesses] in the key U.S. market." (CAC

---

[8] In Q4 FY21, Lightspeed refined the term "total software and payments revenue" to "total subscription revenue and transaction based revenue" so as to reflect its decision to segregate reporting for these two revenue streams. (*Compare* Ex. H at 6 *with* Ex. D at 6.)

¶ 67.) Lightspeed expected that the acquisition would "accelerate product innovation and the advancement of [Lightspeed]'s analytics-driven commerce platform." (*Id.* ¶ 65.)

In March 2021, Lightspeed announced its acquisition of Vend, a "cloud-based retail management software company" based in New Zealand. (Ex. B at 3; *see also* CAC ¶ 72.) Vend "buil[t] . . . Lightspeed's foothold in Asia-Pacific, approximately doubling the company's customer base . . . in th[e] region." (CAC ¶ 72.) In a press release announcing the transaction, Lightspeed opined that "the combination of Lightspeed with the talent and technology of Vend . . . will help to further growth by ultimately providing the Vend customer base access to [Lightspeed's] broader commerce solutions…" (*Id.*)

**E.      Spruce Point Publishes the Short Report and Plaintiffs Reflexively File Suit**

On September 29, 2021, Spruce Point published a short-seller report entitled "Putting the Brakes on Lightspeed." (CAC ¶ 5.) The Short Report claimed that (i) "'Lightspeed [had] massively inflated its business pre-IPO, overstating its customer count by 85% and gross transaction volume ('GTV') by 10%'"; (ii) the Company had experienced "'declining organic growth and business deterioration through [its] IPO, despite management's claims . . . [of] Average Revenue Per User ('ARPU') . . . increasing'"; and (iii) its "'[r]ecent acquisition spree ha[d] come at escalating costs with no clear path to profitability.'" (*Id.*) Many of the Short Report's allegations focused on Lightspeed's business and disclosures before it became a public company, including metrics reported as early as 2014. (CAC ¶¶ 25-30, 32.)

In the Short Report, Spruce Point advised readers to "assume" that it "has a short position" in Lightspeed stock and "therefore stand[s] to realize significant gains in the event that the price declines." (Ex. A at 2.) Spruce Point also warned that "[t]here can be no assurance that any statement, information, projection, estimate, or assumption made reference to directly or indirectly in [the Short Report] will be realized or accurate." (*Id.*) Following publication of the Short Report,

11

"Lightspeed's stock price fell $13.73 per share, or 12.2%, to close at $98.77 per share on September 29, 2021." (CAC ¶ 90.) This action was filed on November 16, 2021 (ECF No. 1) and Plaintiffs filed the CAC on April 27, 2022, relying heavily on the Short Report. (CAC.)

**ARGUMENT**

**I.        THE CAC SHOULD BE DISMISSED WITH PREJUDICE**

A complaint alleging securities fraud must meet the heightened pleading standards of the PSLRA and Rule 9(b). *See Saltz v. First Frontier, L.P.*, 485 F. App.'x 461, 463 (2d Cir. 2012) (Cogan, J., sitting by designation); *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 102, 106 (E.D.N.Y. 2021) (Cogan, J.). To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege, among other things, particularized facts demonstrating that each defendant (i) made a misstatement or omission of material fact, (ii) with scienter, (iii) that caused the plaintiff's loss. *See Saltz*, 485 F. App'x at 463. The CAC falls well short of meeting these standards.

**A.        Plaintiffs Fail To Plead Any Misstatements
Regarding Lightspeed's Key Performance Indicators**

**1.        Plaintiffs Do Not Plead Any Misstatements Concerning GTV**

First, Plaintiffs' allegation that Lightspeed "massively overstated" its GTV (CAC ¶ 22) fails for multiple reasons. As a threshold matter, every alleged GTV misstatement occurred well before the Class Period, including numerous examples that stretch back to 2014 and 2015—many years before Lightspeed was even a public company. (*Id.* ¶¶ 26-27.) This alone defeats Plaintiffs' claims, since it is well-settled that "[a] defendant is only liable for statements made during the class period." *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *1 (S.D.N.Y. Mar. 31, 2022). Moreover, Plaintiffs never explain how their pre-Class Period allegations are in any way relevant to whether Lightspeed overstated its GTV years later during the Class Period. Instead,

12

Plaintiffs merely list Lightspeed's reported figures for GTV during the Class Period, often as part of long block quotes from the Company's SEC filings, and then cross-reference without elaboration the paragraphs devoted to, *inter alia*, Lightspeed's pre-Class Period disclosures. (*E.g.*, CAC ¶ 68.) This is a far cry from what the PSLRA requires. *See In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *14 (S.D.N.Y. Mar. 29, 2021) ("[P]laintiff's use of large block quotes . . . followed by generalized explanations of how the statements were false or misleading are not sufficient"); *Brady*, 2019 WL 3553999, at *10-11 (rejecting allegations that relied on "legal conclusions and speculation" to "simply conclude that something nefarious occurred").

Recognizing this defect, Plaintiffs seek to recast their misrepresentation claim as one of *nondisclosure*, asserting that "[a]t no point, . . . at the time of the IPO or thereafter, did Defendants reveal Lightspeed's nefarious history of wildly overstating its GTV." (CAC ¶ 25.) Courts have decisively rejected this pleading tactic as well, since a contrary rule "would undercut the meaning of the Class Period and eviscerate the statute of limitations." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016). Indeed, such a "never-ending duty of disclosure" would usher in a radical expansion of Exchange Act liability, since it "could always be argued that allegedly false statements made long before the Class Period and outside the statute of limitations should be corrected by a statement within the Class Period." *Id.*

Even putting aside this fatal flaw, Plaintiffs' GTV allegations merely repackage Spruce Point's own speculative claims with no apparent effort at independent verification. For example, the CAC ignores that Lightspeed did not even disclose GTV at the time of the purported pre-Class Period misstatements. Merely relying on the Short Report, Plaintiffs cite a variety of figures Lightspeed supposedly posted on its website when it was a private company, suggesting without

support that those undefined metrics are analogous to GTV. (CAC ¶¶ 26-28 (discussing "transactions" and "customers"); Ex. A at 13, 16 (discussing "transactions processed").)

While Plaintiffs attempt to marshal statements from three anonymous "confidential witness" sources on this point (CAC ¶¶ 23-24), none of these individuals is "described at a sufficient level of particularity to 'indicate a high likelihood that [he or she] actually knew facts underlying their allegations.'" *Long Miao*, 442 F. Supp. 3d at 803. Plaintiffs, for instance, lean heavily on a former employee recruited by Spruce Point (CAC ¶ 23), but Spruce Point does not share any details about this individual's position or dates of employment (Ex. A at 14). Plaintiffs supply none of these particulars either—a strong indication that they never even contacted this individual. *See In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("[I]t would be inappropriate" to credit a CW when there "is no suggestion that counsel in th[e] action ha[d] spoken with the[] confidential witnesses or even kn[ew] who they [were]."). Plaintiffs' descriptions of CW5 and CW7 are just as thin—as alleged, both were low-level managers who served in customer-facing (rather than financial reporting or accounting) roles. (CAC ¶ 24 & nn.3-4.) As such, there is no basis to conclude that either was qualified to opine on the accuracy or transparency of GTV—or any other metric.

Even if credited, these CW statements are far too vague to advance Plaintiffs' claim. Indeed, while Plaintiffs repeatedly quote one CW as characterizing GTV as a "PR number" and "smoke and mirrors" (*id.* ¶¶ 23-24), these pejoratives are not paired with clarifying facts, rendering them meaningless. *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019). Even more fundamentally, the thrust of these criticisms appears to be that "[Lightspeed] could report GTV equal to the 'entire transaction' with customers," and "not what [the Company was] making on the transaction." (CAC ¶ 24 (citing CW 7); *see also id.* ¶ 23.) But this methodology

14

was no secret: Lightspeed's Class Period financial reports repeatedly disclosed that GTV (i) represents "the *total dollar value* of transactions processed through our cloud-based SaaS platforms in the period, net of refunds, inclusive of shipping and handling, duty and value-added taxes," and (ii) "*does not represent revenue earned by us*." (*See, e.g.*, Ex. E at 5.) This description "says it all," *Curaleaf*, 519 F. Supp. 3d at 107, leaving no doubt as to how Lightspeed was calculating GTV.

Put simply, there was no "smoke" and there were no "mirrors"—just a plainly-worded disclosure of the very information that was supposedly omitted. *Id.* at 101 (dismissing claims "premised on the nondisclosure of information that was actually disclosed").

### 2. Plaintiffs Do Not Plead Any Misstatements Concerning Customer Counts

Plaintiffs next accuse Lightspeed of "misstat[ing] its customer count" in its Canadian IPO Prospectus, which was issued in March 2019—roughly eighteen months before the Class Period (and U.S. IPO). (CAC ¶ 29.) There is no well-pled allegation that this March 2019 "misstate[ment]," even if it occurred, bears on whether customer counts were misrepresented during the Class Period. Again, this compels dismissal. (*See* Point I(A)(1), *supra*.)

Plaintiffs' allegation, though irrelevant, fails for a more basic reason: Plaintiffs misinterpret the data in the Canadian IPO prospectus. The CAC contends that "[o]n March 7, 2019, Lightspeed disclosed . . . that they had $13 billion GTV and over 47,000 *customers*," even though the accurate figure was purportedly 27,000. (CAC ¶ 30.) But the figure that Lightspeed disclosed was 47,000 *Customer Locations*, not customers. (Ex. K at 2.) As the Canadian IPO Prospectus explained, the terms represent distinct metrics: "'Customer Location' means a billing customer location for which the term of services ha[s] not ended, or with which we are negotiating a renewal contract. *A single unique customer can have multiple Customer Locations* including physical and eCommerce sites." (*Id.* at 33.) Because one customer can operate multiple locations, you would expect the Customer

15

Locations figure to be higher. Notably, Plaintiffs do not claim the 47,000 *Customer Locations* figure was misstated.

As for unique customers, the Canadian IPO Prospectus disclosed that for the twelve-month period ending December 31, 2018, its GTV per customer was $500,000 and its GTV was $13.6 billion. (*Id.* at 2.)[9] The resulting computation ($13.6 billion / $500,000) produces a customer count of 27,200—virtually identical to the number that Plaintiffs hold out as being accurate. (CAC ¶ 30.) In short, there was no misstatement, and Plaintiffs' cries of fraud are a function of their own failure to read the Company's disclosures.

**3.      Plaintiffs Do Not Plead Any Misstatements Concerning Customer Locations**

Lifting another claim from the Short Report, Plaintiffs next accuse Defendants of misrepresenting that Lightspeed's Customer Locations (inclusive of Vend) had reached "over 140,000" by the end of Q4 FY21 (i.e., March 31, 2021), when in fact the figure was supposedly lower. (CAC ¶¶ 48-49.) To prop up this claim, Plaintiffs point to Lightspeed's March 11, 2021 announcement of the Vend acquisition, which stated that the combined companies would "serve . . . over 135,000 customer locations worldwide" after the closing. (*Id.* ¶ 48.) Comparing the two numbers ("over 140,000" and "over 135,000"), Plaintiffs speculate that 5,000 Customer Locations could not have been added "in that brief amount of time"—which it calculates as the twenty days between March 11, 2021, when the Vend press release was issued, and March 31, 2021, when Q4 FY21 concluded. (*Id.* ¶ 49.)

Plaintiffs' theory rests on a faulty predicate: that the March 11 projection of "over 135,000" Customer Locations was based on reported figures *as of that date*. It was not. As the March 11 press release makes clear, the figure was "based on December 31, 2020 reported numbers." (Ex.

---

[9] Plaintiffs incorrectly allege that the GTV figure was $13 billion when in fact it was $13.6 billion.

16

L at 1 n.1.) Tellingly, Spruce Point made the same mistake, suggesting that Plaintiffs simply embraced it without reading Lightspeed's press release or conducting any diligence. (*See* Ex. A at 93.) This alone warrants rejection of Plaintiffs' theory. *Long Miao*, 442 F. Supp. 3d at 804 (expressing "concern[]" that plaintiff not only failed to "catch[]" short report's "significant factual errors" but "reproduced [them] in the FAC"). But even if it did not, Plaintiffs fail to cite a single fact, figure, or document from which to infer that Lightspeed was incapable of adding—or in fact did not add—approximately 5,000 Customer Locations over three *months* (rather than three weeks), to reach "over 140,000 Customer Locations" as of March 31, 2021.[10]

### 4. Plaintiffs Do Not Plead Any Misstatements Concerning ARPU

Plaintiffs also allege that Lightspeed "quietly altered its definition of ARPU three times, burying the subtle change within its filings, to make it seem as though ARPU continued to increase." (CAC ¶ 33.) As support, Plaintiffs cite three changes that Lightspeed made to the ARPU definition between March 2019 and September 2020. (*Id.*) Of course, these allegations are self-defeating: Plaintiffs only know about the adjustments because Lightspeed disclosed them in its financial reports. As this Court observed in *Curaleaf*, plaintiffs cannot "premise[] [claims] on the nondisclosure of information that was actually disclosed." 519 F. Supp. 3d at 101.

Nor can Plaintiffs dodge this principle by complaining that the disclosures were "bur[ied]." (CAC ¶ 33.) The definitional changes were prominently segregated into a section of each report under a heading that was titled, in boldface font for emphasis, "**Key Performance Indicators**." (*See* Ex. I at 4; Ex. E at 5.)  Because "'investors are presumed to have the ability to be able to digest varying reports and data,'" nothing more was required. *See Emerson v. Mut. Fund Series*

---

[10]  The CAC also ignores that the figures do not purport to be exact numbers. Rather, both use the phrase "*over* [x] customers," and Plaintiffs fail to explain why they are not entirely consistent.

*Tr.*, 393 F. Supp. 3d 220, 247 (E.D.N.Y. 2019); *Brady*, 2019 WL 3553999, at \*15; *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) ("[D]isclosure requirements are not intended to attribute to investors a child-like simplicity.").

Plaintiffs' theory also makes no sense. The CAC posits that Lightspeed "altered" the definition of ARPU so that it could "swap the denominator from the larger customer count number to a smaller customer location number, thereby artificially increasing the ARPU metric." (CAC ¶ 33.) But Plaintiffs have it backwards: Customer Location numbers are by definition larger than customer numbers, since customers can operate in more than one location. Thus, when Lightspeed started using Customer Locations to calculate ARPU, the denominator became larger (not smaller), thereby causing ARPU to decrease (not increase). The Company's public filings confirm as much. For instance, in Q1 FY21, Lightspeed reported two figures: an ARPU of $245 based on customers and a ***lower*** ARPU of $160 based on Customer Locations. (Ex. I at 3.)

### 5.  Plaintiffs Do Not Plead Any Misstatements Concerning TAM

Plaintiffs similarly fail in their claim that Lightspeed "vastly overstated its Total Addressable Market ('TAM')" by disclosing an estimate of $113 billion in August 2019—thirteen months before the Class Period. (CAC ¶ 31.) Plaintiffs' theory is difficult to discern, since it fills just one paragraph of the 118-paragraph CAC. Apparently, Plaintiffs believe this figure must have been misleading because Lightspeed purportedly "lowered" its TAM to $16 billion two years later. (*Id.*) This naked assumption, though, cannot form the basis for imposing liability for several reasons. First, any supposed "overstatement" would have occurred years before the Class Period, rendering it irrelevant. (*See* Point (I)(A)(1), *supra*.) Plaintiffs do not claim that the $16 billion figure was misleading *during the Class Period*—indeed, TAM is not even mentioned in the section of the CAC devoted to Defendants' alleged misstatements. (CAC ¶¶ 52-82.)

18

Second, even if it were an overstatement (and it was not), Plaintiffs do not identify a contradictory prediction, report, or fact which suggests that the $113 billion figure was false or misleading when made. Instead, the CAC points to a later disclosure and claims, without more, that the earlier disclosure must have been "overstated." (CAC ¶ 31.) That is textbook "fraud by hindsight" that "has been routinely rejected." *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *16 (S.D.N.Y. Mar. 15, 2022).

Third, TAM estimates were explicitly couched as forward-looking *opinions* about Lightspeed's future market opportunity. (*See, e.g.*, Ex. M at S-8 ("*[W]e believe* that we have a current total addressable market of over $16 billion.").) As such, for the reasons outlined at Point I(C)(3), *infra*, these subjective beliefs are protected under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), unless Plaintiffs can allege with specificity that they were not genuinely or reasonably held at the time. Plaintiffs do not even try. And, in any event, strategic changes such as which metrics a company chooses to report are not actionable under the federal securities laws. *See In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *11 (S.D.N.Y. Mar. 30, 2021) (A "change in business strategy does not, without more, render . . . past disclosures regarding [a particular business strategy] misleading."). [11]

---

[11] The Court need not reach this issue, but Lightspeed did not "lower" TAM as Plaintiffs claim. Rather, during the Class Period, Lightspeed began providing greater clarity to its TAM estimate by disclosing information about a more specific, near-term target demographic within the $113 billion estimate. As publicly disclosed, Lightspeed relied on figures provided by the consultancy firm AMI Partners as to the size of its market. AMI Partners calculated that there were 47 million retail and restaurant small and medium-sized businesses ("SMBs") globally, of which Lightspeed estimated 6 million were "optimally suited" for its platforms. (Ex. J at S-7, S-8; Ex. M at S-7, S-8.) The $113 billion TAM is derived from the larger, 47 million SMB figure, while the more specialized, $16 billion TAM is calculated from a disclosed subset of the 47 million (i.e., the 6 million figure). As Lightspeed publicly disclosed, this $16 billion TAM represents the "current total addressable market," as compared to the larger universe of retailers and restaurants, which Lightspeed intends to target over a longer time period. (Ex. M at S-8.) Tellingly, Plaintiffs omit this vital context from the CAC.

19

Finally, it bears mention that Plaintiffs' "TAM theory" was simply lifted from the Short Report, which itself offers only conclusory claims of "massive" TAM "inflation." (Ex. A at 7, 22.) Courts need not credit secondary sources that are themselves insufficiently detailed. *See Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 181 (S.D.N.Y. 2018) (rejecting securities fraud claim based on speculation in Spruce Point report).[12]

### B.    Plaintiffs Do Not Plead Any Misstatements Concerning Organic Revenue Growth

### 1.    Statements Concerning Organic Revenue Growth for Q3 FY21

The CAC next accuses Lightspeed of hiding a purported decline in "organic [revenue] growth" during Q3 FY21. (CAC ¶¶ 21, 36.) To support this contention, Plaintiffs rely on a so-called "balance sheet allocation analysis" from Spruce Point that misleadingly focuses on only two metrics: deferred revenue and trade receivables. (*Id*. ¶ 36.)

More specifically, Plaintiffs assert that Spruce Point "back[ed] out" the deferred revenue and trade receivables contributions of two recent acquisitions, ShopKeep and Upserve. (*Id*.) Based on that, Plaintiffs allege that Lightspeed recorded declines in both organic deferred revenue and organic trade receivables. (*Id*.) Plaintiffs then deduce that, because organic deferred revenue and organic trade receivables allegedly declined, a different metric (organic Software and Payments revenue) must have declined as well—thereby rendering Lightspeed's claim of organic revenue

---

[12] Plaintiffs also contest Lightspeed's certification of internal controls for FY21. (CAC ¶ 75.) But Plaintiffs fail to plausibly allege that Lightspeed issued inaccurate financial statements *at any time*, let alone during the period covered by the certification—"as at March 31, 2021." (*Id.*) There is, therefore, no basis for questioning this disclosure. *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 470 (S.D.N.Y. 2018). Lightspeed, moreover, "did not state that the Company's internal controls were effective—[it] stated only that management had *concluded* as much." *Schiro*, 396 F. Supp. 3d at 299. Plaintiffs nowhere contend that management did not reach or believe this conclusion. *Id.*

growth false. (*Id.*) Plaintiffs do not offer any factual support for their faulty assumption, which is belied by Lightspeed's own public disclosures.

As Lightspeed explained to investors, it generates "*transaction-based revenues*" in the form of "payment processing fees and transaction fees …processed by . . . customers" through the Company's platform. (Ex. B at 12.) One source of transaction-based revenues is Lightspeed Payments. (*Id.*) Unlike with subscriptions, the fees generated by Lightspeed Payments *do not* create deferred revenue or trade receivables—the two metrics on which Plaintiffs focus.

The CAC utterly ignores this disclosure, just as it ignores the dramatic growth that Lightspeed Payments experienced during the Class Period. As the Company disclosed, revenue from Lightspeed Payments "grew 371% in Fiscal 2021 compared to Fiscal 2020, with overall transaction-based revenue growing from $28.1 to $83.0 million." (*Id.* at 5.) Lightspeed's revenue mix also shifted, with a greater proportion being derived from transaction-based revenues. In fact, Lightspeed reported that "[f]or the three and six months ended September 30, 2021, . . . transaction-based revenue accounted for 49% and 49%, respectively, of . . . total revenues," as compared to "34% and 31% respectively, for the three and six months ended September 30, 2020." (Ex. C at 4.) The CAC also omits another relevant shift in Lightspeed's business model: as the Company disclosed in Q3 FY21, it had "become more accommodating of monthly payment plans for our customers aimed in part to encourage adoption of Lightspeed Payments." (Ex. F at 3.) This means that with greater frequency, Lightspeed was entering into subscription plans with shorter contract terms, which in turn was resulting in less deferred revenue.[13]

---

[13] For instance, in the quarter at issue, Lightspeed readily disclosed "a decrease of $1.4 million in deferred revenue due to shorter contract duration." (Ex. F at 23.)

21

This explains how Lightspeed could record organic revenue growth while, at the same time, experience an incremental decrease in deferred revenue and trade receivables. Put simply, Lightspeed was earning more revenue—in both absolute and percentage terms—from a segment of its business (Lightspeed Payments) that does not create deferred revenue and trade receivables. In light of these indisputable facts, this Court should reject Plaintiffs' blindered formulation of "organic revenue growth," which is contradicted by the Company's actual disclosures. *See In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 31-32 (E.D.N.Y. 2021) (Cogan, J.) (rejecting premise that issuer had duty to "adopt plaintiffs' preferred description" of items in registration statement).[14]

### 2.    Statements Concerning Organic Revenue Growth for Q1 FY22

Plaintiffs also allege that during its Q1 FY22 investor call, Lightspeed "failed to reveal" that its receivables purportedly had "declined quarter-over-quarter by 20%," thereby masking an alleged decline in "organic [revenue] growth." (CAC ¶ 37.) For this claim, Plaintiffs copy—without elaboration or analysis—yet another chart from the Short Report. As alleged therein, if one subtracts the quarterly trade receivables of recently acquired Vend ($3.9 million) from Lightspeed's overall trade receivables ($13.4 million), you are left with "organic" trade receivables ($9.5 million) for Q1 FY22 that are, according to Spruce Point, 20% lower than the $12 million organic receivables figure reported one quarter earlier. (CAC ¶ 37; Ex. A at 54.)

---

[14] The CAC claims that in Q3 FY21, Defendants tried to "make the [ShopKeep and Upserve] acquisitions appear more successful than the reality" by stating that the companies had contributed $7.4 million to Lightspeed's quarterly revenue, even though the number was lower. (CAC ¶ 44.) Plaintiffs do not contest that ShopKeep and Upserve did, in fact, combine to generate $7.4 million in software and payments revenue. But as the Company accurately reported elsewhere in the same Form 6-K, this amount was "for the *nine months* ended December 31, 2020," not the three months ending December 31, 2020. (*See* Ex. F at 17.) If Defendants had wanted to mislead investors into believing that the Company's "acquisitions . . . [were] more successful than the reality" (CAC ¶ 44), they would not have reported the correct time period at all, let alone in the same disclosure. The correction of this minor error also underscores its immateriality.

22

But this is just a misleading, apples-to-oranges comparison. Lightspeed did not report in Q1 FY22 that Vend's trade receivables were $3.9 million; it disclosed that Vend possessed "trade receivables *and other assets*" of $3.9 million. (Ex. N at 8.) A more apt comparison would have been to subtract $3.9 million from Lightspeed's overall trade receivables *and other assets*.[15] This analysis was not performed, however, either in the Short Report or the CAC. Plaintiffs' claim should thus be rejected. *See Okla. Firefighters*, 951 F. Supp. 2d at 496-97 (dismissing 10(b) claim that "compare[d] apples to oranges" by making "determinations" that "require[d] wholly different accounting judgments and calculations").

Further, even if this calculation had been performed and showed a quarter-over-quarter loss in organic trade receivables and other assets, that fact alone would not indicate a decline in organic revenue growth. Again, as Lightspeed disclosed throughout the Class Period, its global rollout of Lightspeed Payments was causing a larger proportion of its organic revenue to be comprised of a certain type (transaction-based) that does not generate trade receivables. (*See* Point (I)(B)(1), *supra*.) Thus, Plaintiffs' analysis is not "evidence of declining business" (Ex. A at 54) or falsity; it is a reflection of an evolving business model that was clearly communicated to investors.

## C.    Plaintiffs Do Not Plead Any Misstatements Concerning Acquisitions

Plaintiffs' last theory is that Lightspeed exaggerated the potential benefits of acquiring ShopKeep, Upserve, and Vend while, at the same time, concealing that it (i) had "no plans to integrate these companies"; and (ii) had pursued all three merely to "mask[] [an] . . . organic growth decline." (CAC ¶ 35.) These statements fall into two categories: the merger announcements and disclosures concerning integration (the "Acquisition Statements"), neither of which is actionable.

---

[15] Plaintiffs make the same error with respect to their allegations regarding the decline in trade receivables if one subtracts out the ShopKeep and Upserve acquisitions. (CAC ¶ 36.)

23

### 1.        Plaintiffs Fail to Plead Falsity as to Any Acquisition Statement

First, many of the Acquisition Statements were optimistic projections about the anticipated benefits of each transaction. (*See, e.g.*, CAC ¶¶ 58, 60 (ShopKeep); *id.* ¶¶ 65-66 (Upserve); *id.* ¶¶ 72-73 (Vend).) As such, they "are too vague and general to be actionable" under the federal securities laws. *In re Micro Focus Int'l*, 2020 WL 5817275, at *5 (deeming non-actionable "optimistic projections that discuss[ed] hoped-for outcomes of the Merger"). Courts regularly dismiss similar allegations based on acquisition- and merger-related statements. *Id.* at *6; *In re Diebold*, 2021 WL 1226627, at *9 (rejecting integration-related disclosures as "vague statements of corporate optimism").[16]

Moreover, Plaintiffs do not plausibly allege that any of these statements were "contemporaneously false." *In re Diebold*, 2021 WL 1226627, at *7. For example, Plaintiffs contest Lightspeed's prediction that the ShopKeep deal would provide merchants with "even more crucial product innovation and world-class support as they drive the reinvention of American commerce." (CAC ¶ 58.) But the CAC alleges no facts suggesting that these aspirational statements "were not genuinely and reasonably believed when made." *In re Micro Focus Int'l*, 2020 WL 5817275, at *6. Instead, Plaintiffs cross-reference Paragraphs 21-44 of the CAC without further explication—directing the Court to, in effect, make the supposed connection on its own. (CAC ¶¶ 59, 64, 68, 71.)

Plaintiffs' other efforts at pleading falsity are just as "short on specifics." *Harris*, 135 F. Supp. 3d at 159. For example, Plaintiffs challenge positive statements about the ShopKeep

---

[16] Examples of such "puffery" abound here. (*See, e.g.*, CAC ¶¶ 54, 58, 60, 67, 72, 74, 77, 79, 80.) Plaintiffs cannot plead falsity with respect to such statements, which are "'too general to cause a reasonable investor to rely upon them.'" *Bldg. Trades Pension Fund*, 2022 WL 784017, at *12; *see also Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 173-74 (2d Cir. 2020).

transaction as misleading because "ShopKeep was near bankruptcy and had limited growth; Upserve's business was in decline; and Vend was falling severely short of its financial expectations." (CAC ¶ 35.) No details are offered to support these critiques. But even if the Company's targets had been struggling as independent companies, that fact alone would not contradict Lightspeed's stated expectations for how these businesses might create value once folded into the Company's platforms. Investors had the ability to examine publicly available data and judge for themselves whether ShopKeep, Upserve, and Vend were underperforming and whether, as a result, Lightspeed was overvaluing them as acquisition partners. *See Curaleaf*, 519 F. Supp. 3d at 108 ("[S]ecurities laws require disclosure only of information that is not otherwise in the public domain . . . .").[17] Indeed, Spruce Point's own (conclusory) appraisal—which Plaintiffs simply parrot—was based on its analysis of the *public* record. (CAC ¶ 87; Ex. A at 8.)

Moreover, Plaintiffs fail to "demonstrate with specificity why" Defendants' statements were false when made. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Again, there is no basis to infer that Lightspeed's organic growth was even declining (*see* Point I(B), *supra*), let alone that a desire to "mask" this non-existent decline was fueling management's acquisition strategy. And the CAC does not contain a shred of support for the fanciful—and economically irrational— premise that Lightspeed acquired three companies with no intention of successfully integrating them. Courts may ignore such nonsensical theories. *See Friedman*, 2018 WL 446189, at *6 (rejecting concealment of "secret plan" to "sabotage a thriving business unit" as part of integration strategy, which "would have made little sense"); *see also Micro Focus Int'l*, 2020 WL 5817275,

---

[17] Lightspeed publicly filed ShopKeep and Upserve's financial statements, as well as pro forma consolidated financial statements for Lightspeed, on February 8, 2021. (*See* Ex. O.)

at *6 ("Plaintiff pleads no facts showing Micro Focus did not plan to integrate their system with HPE.").

This conclusion is not impacted by Plaintiffs' CW allegations—all of which boil down to a claim that Company officials touted merger-related synergies but in the end never delivered on their supposed intentions. (*See, e.g.*, CAC ¶¶ 38, 39, 41.) Such baseless critiques may be disregarded—both because they are hindsight-based and because their central premise, that management failed to "deliver," is not actionable under the federal securities laws.[18] *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) ("Section 10(b) . . . does not reach mere 'instances of corporate mismanagement.'"); *Friedman*, 2018 WL 446189, at *6 (allegation "that the integration of Par and Endo was not as seamless as Defendants had. . . expected" represented non-actionable "'fraud by hindsight'").

**2.    Many Acquisition Statements Are Protected by the PSLRA Safe Harbor and Bespeaks Caution Doctrine**

Plaintiffs' claims also fail because there is no allegation that Lightspeed ever guaranteed any facet of its acquisition plans to anybody. To the contrary, the Company repeatedly cautioned that the process could be more difficult than anticipated. Under "the PSLRA's safe harbor, a defendant 'shall not be liable with respect to any forward-looking statement' if (1) [it] is 'identified' as such and 'accompanied by meaningful cautionary statements' or (2) the forward-looking statement is 'immaterial,' or (3) the plaintiff 'fails to prove that [a] forward-looking statement . . .

---

[18] Moreover, Lightspeed has disclosed concrete ways in which these acquisitions *have* been integrated, further undercutting Plaintiffs' theory. For example, in May 2022, Lightspeed announced a new retail solution, Lightspeed Retail, which "combines the top features from solutions acquired from and developed by Vend" and other acquired companies. (Ex. P at 11-12.) Also in 2022, Lightspeed launched Lightspeed Restaurant, its hospitality commerce and point-of-sale solution, which "integrates the top features from solutions acquired from and developed by Upserve" and other acquired companies. (*Id.* at 11.)

if made by a natural person, was made with actual knowledge'" of its falsity. *In re FedEx Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 232 (S.D.N.Y. 2021) (quoting 15 U.S.C. § 78u-5(c)(1)).[19] Because liability attaches "only upon proof of knowing falsity," the "scienter requirement for forward-looking statements is stricter than for statements of current fact." *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 355-56 (S.D.N.Y. 2020).

This test bars Plaintiffs from challenging Lightspeed's stated "plans and objectives" for its acquisitions. *Bldg. Trades Pension Fund*, 2022 WL 784017, at *7 (quoting 15 U.S.C. § 78u-5(i)(1)).[20] Lightspeed's public filings, both in Canada and the U.S., were full of tailored warnings about the risks of pursuing growth through acquisitions. For instance, Lightspeed warned, in boldfaced and italicized type for emphasis, that the Company "***ha[d] . . . made. . . acquisitions and investments that could divert management's attention, result in operating difficulties and dilution to our shareholders and otherwise disrupt our operations and adversely affect our business, operating results or financial position***." (Ex. Q at 29.) As the Company emphasized, this "process of acquiring and integrating another company or technology could create unforeseen operating difficulties and expenditures, whether or not such transactions are ultimately completed." (*Id.* at 30.) Lightspeed went further, stressing that its acquisitions "involve a number of risks, such as":

- "difficulty integrating. . . accounting systems and operations of the acquired company";
- "coordination of product, engineering and selling and marketing functions";

---

[19] The "bespeaks caution doctrine" similarly offers protection for "forward-looking statements that adequately disclose the risk factors that might cause a different outcome" than the one forecast. *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 355 n.7 (S.D.N.Y. 2020).

[20] *See also Rombach*, 355 F.3d at 172-173 (press release with "optimistic statements" that integration of businesses was "'well underway' and progressing smoothly" were forward-looking).

- "difficulty integrating, supporting or enhancing acquired product lines or services"; and

- "retention and integration of employees from the acquired company . . . ."

(*Id.*)[21] These pointed, granular details "directly relate[] to" Plaintiffs' claims and belie them. *In re Nokia*, 423 F. Supp. 2d at 401. As such, they provide an additional, independent ground for dismissal. *See In re Micro Focus Int'l*, 2020 WL 5817275, at *6 (plaintiff failed to plead how merger disclosures were misleading given company's "detailed statements of risk," including its "list of key potential difficulties with effecting the integration"); *Curaleaf*, 519 F. Supp. 3d at 108 (holding that "on-point public disclosures [were] fatal to plaintiff['s] claims").

### 3.   Many Acquisition Statements Are Protected Opinions

Many of the challenged Acquisition Statements also fail *Omnicare's* demanding pleading requirements for imposing opinion-based liability. 575 U.S. at 194. Plaintiffs must allege facts sufficient to show that "(1) 'the speaker d[id] not hold the belief . . . professed'; (2) the 'fact[s] [] supplied' in support of the belief professed [were] 'untrue'; or (3) the speaker 'omit[ted] information' that 'makes the statement misleading to a reasonable investor.'" *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)); *see also Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). When pursuing an omission theory, plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."

---

[21] The same cautionary statements were included in Lightspeed's Annual Information Form for FY20, which in turn was incorporated by reference into the Company's U.S. Amended Registration Statement. (Ex. R at 36-37.)

28

*Sanofi*, 816 F.3d at 209 (quoting *Omnicare*, 575 U.S. at 194). As the Second Circuit has emphasized, meeting the *Omnicare* standard "is no small task for an investor." *Id.* at 210.

Here, there is no dispute that many of the challenged statements are quintessential expressions of belief and thus fall squarely within the ambit of *Omnicare*. (*See, e.g.*, CAC ¶ 69 ("*I believe* we are developing an expertise in integrating acquisitions."); *id.* (opining that "integration [of ShopKeep and Upserve] is well under way, with operations *expected to be* fully integrated by April and product by end of summer").) Indeed, the press releases announcing each transaction— ShopKeep, Upserve, and Vend—were brimming with subjective expectations about the future. (*See id.* ¶¶ 58, 65, 72.) The same is true for the statements where Lightspeed opined about management's developing expertise in absorbing acquisitions, the progress of integration efforts to date, and the projected timetable for completion. (*See, e.g.*, *id.* ¶ 70 ("*[W]e believe* that smart acquisitions will accelerate our leadership position and unlock many revenue, expense and technology synergies[.]"); *see also id.* ¶ 65.)

Distilled to its fundamentals, Plaintiffs' theory is that Lightspeed's optimistic opinions were misguided. But optimism is not fraud. As "the Second Circuit 'has firmly rejected [the] fraud by hindsight approach,' it is 'not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events.'" *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 223 (S.D.N.Y. 2020); *Friedman*, 2018 WL 446189, at \*7 (S.D.N.Y. Jan. 16, 2018) (operational criticisms "'are not actionable under the securities laws'"). Rather than identify a single undisclosed fact, material or otherwise, that conflicted with Defendants' optimistic remarks when made, Plaintiffs cobble together conclusory critiques from low-level former employees with no apparent role in—or insight into—Lightspeed's global acquisition strategy or integration plans, or cut and paste the self-interested (and uncorroborated) statements

29

of Spruce Point. The Court should reject these legally insufficient allegations. *See Friedman*, 2018 WL 446189, at \*5 (disclosures about integration and success of acquisitions were non-actionable "expressions of opinion or expectation").

### D.      Plaintiffs Fail To Plead a Strong Inference of Scienter

Under the PSLRA, a complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." PSLRA § 78u–4(b)(2). To plead scienter, Plaintiffs must allege particularized facts "showing '(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'" *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355 (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)). For forward-looking statements, the bar is even higher: Plaintiffs must demonstrate "actual knowledge." *Bldg. Trades Pension Fund*, 2022 WL 784017, at \*7. The CAC falls far short of these demanding standards.

### 1.      Plaintiffs Fail To Plead a Cognizable Motive

As to motive, a complaint must allege specific facts that a defendant "benefitted in some concrete and personal way from the purported fraud." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198. Here, Plaintiffs focus solely on Dasilva's Class Period trading in Lightspeed stock. (CAC ¶ 51.) But "stock sales support . . . motive only where 'those trades are suspicious in timing or amount.'" *Iconix Brand Grp., Inc.*, 2017 WL 4898228, at \*15 (S.D.N.Y. Oct. 25, 2017); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). To plead that trading was unusual, "[p]laintiffs must allege," *inter alia,* "overall percentage changes in defendant's holdings.'" *City of N. Mia. Beach*, 2021 WL 212337, at \*8 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011)). No such facts are pled here.

30

First, Plaintiffs supply no information about Dasilva's total holdings, and with good reason: public records confirm that Dasilva divested only a small fraction (5.1%) of his Lightspeed stock during the Class Period. (*See* Ex. S.)[22] This means that Dasilva retained the vast majority of his holdings throughout the Class Period, a fact which "is fatal to establishing scienter based upon trading activity." *Tung v. Bristol-Myers Squibb Co.*, 2020 WL 5849220, at \*6 (S.D.N.Y. Sept. 30, 2020), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022); *Glaser*, 772 F. Supp. 2d at 593. Indeed, courts have repeatedly rejected motive allegations in cases where individuals sold even greater percentages of stock than are present here. *See, e.g.*, *Acito*, 47 F.3d at 54 (sale of "less than 11%" "failed to establish that [the insider's] stock sales were 'unusual'").[23]

Second, Plaintiffs omit that Dasilva sold more shares *before* the Class Period—i.e., before the supposed fraud began. (*See* Ex. S) (sale of 8.62% of then-existing shares on August 22, 2019) The Second Circuit has disregarded motive allegations where "the sales of shares [during the class period] constituted a similar (or lesser) proportion of the individual defendants' trades as compared with the proportion of shares sold by those defendants before the putative class period." *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355.[24]

---

[22] Exhibit S is the Insider Trading Report for Dax Dasilva as drawn from the System for Electronic Disclosure by Insiders ("SEDI"). SEDI is "Canada's on-line and browser-based service for the filing and viewing of insider reports as required by various provincial securities rules and regulations." (SEDI Website, available at: https://www.sedi.ca/sedi/SVTWelcome?locale= en_CA.) Courts may take judicial notice of filings made to Canadian authorities, including SEDI. *See Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at \*22 (S.D.N.Y. May 29, 2013).

[23] *See also Skechers USA, Inc.*, 444 F. Supp. 3d 498, 523-25 & n.15 (S.D.N.Y. 2020) (sale of 10.8%); *Iconix*, 2017 WL 4898228, at \*15-17 (sale of less than 9%); *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at \*13-14 (S.D.N.Y. Mar. 10, 2017) (sale of 10.1%), *aff'd*, 710 F. App'x 471 (2d Cir. 2017).

[24] Plaintiffs also neglect to plead Dasilva's net profits (as opposed to gross proceeds). *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020).

31

Finally, Plaintiffs nowhere allege any other senior Lightspeed official engaged in unusual sales during the Class Period. This silence highlights the implausibility of their theory of a coordinated fraud and negates an inference of motive as to all Defendants. *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 218-19 (S.D.N.Y. 2018) ("'[T]he dispositive factor [regarding motive] is that other insiders, including two other individual defendants, did not sell during the putative class period.'"), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Tech. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

### 2. Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness

Since Plaintiffs cannot plead a cognizable motive, their allegations of conscious misbehavior or recklessness "'must be correspondingly greater.'" *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355. "Recklessness" means "'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *In re Alkermes Pub. Ltd. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 292 (E.D.N.Y. 2021), *aff'd sub nom. Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 2021 WL 5782079 (2d Cir. Dec. 7, 2021). To meet this threshold, plaintiffs "typically must 'specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements.'" *Canez v. Intelligent Sys. Corp.*, 2021 WL 3667012, at *10 (E.D.N.Y. Aug. 18, 2021).

Plaintiffs' allegations fall well below this high bar. The CAC generically posits that the Individual Defendants "knew" their statements were false and misleading "[b]ecause of their positions with Lightspeed, and their access to material information available to them but not to the public." (CAC ¶ 17; *see also id.* ¶ 107.) But it is well-established that merely citing a defendant's position is "entitled to no weight" in assessing scienter. *Chapman*, 466 F. Supp. 3d at 401; *City of N. Mia. Beach*, 2021 WL 212337, at *10 (labeling such allegations "worthless").

Further, "'[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" *Canez*, 2021 WL 3667012, at *10. Plaintiffs fail to plead any particularized facts indicating that any Defendant had access to specific information—whether through an internal report, email, oral communication, or otherwise—that contradicted Lightspeed's public statements when made. For instance, Plaintiffs vaguely allege that Dasilva and President Chauvet (who is not even a Defendant) "had direct access" to two "software/data analytics platform[s]" from which "'they were always pulling reports.'" (CAC ¶ 50.) But the CAC sheds no light on what these unidentified reports contained, when they were "pulled," or how they contradict any disclosure. This nonexistent detail is fatal. *Frankfurt-Tr. Inv. Luxemburg AG*, 336 F. Supp. 3d at 221-22 (rejecting "generic [CW] statements" that "'senior management' had access to sales data" with no description of "when these reports would have been provided to the Executive Defendants" or "what they contained").

In a similar vein, Plaintiffs claim that "[e]very Friday CW5 put together reports for 'weekly board reviews' including reports on gross processing per week, MRR and another metric called QVR." (CAC ¶ 50.) The CAC does not explicitly plead that CW5—or anyone else—actually communicated these supposed reviews to the Board (of which Nussey was not even a member) or any specific information within any "review" that rendered a public statement contemporaneously false. Courts have not hesitated to disregard such thin allegations. *See, e.g.*, *Woolgar*, 477 F. Supp. 3d at 220 (generic allegations that CW submitted "monthly reports" were insufficient); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27-28 (S.D.N.Y. Apr. 2, 2020) (claim that defendants were

33

"provided specific reports, including a 'standard operational packet'. . .,  detailed overviews and presentation decks from each business segment" were insufficient).[25]

### 3.    The More Cogent and Compelling Inference Is Nonculpable

Under *Tellabs*, a court must take into account "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." 551 U.S. at 314. Here, Lightspeed's express descriptions of its Key Performance Indicators, as well as its extensive acquisition-related risk warnings, reflect a company that was attempting to provide accurate and meaningful information to investors as it entered new markets and refined its business. "This steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors." *Lachman*, 487 F. Supp. 3d at 138; *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *22 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Travago N.V.*, 796 F. App'x 31 (2d Cir. 2019).[26]

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

To state a claim under Section 20(a), Plaintiffs must plead "'(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Chen v.*

---

[25] These defects also doom Plaintiffs' effort to plead corporate scienter. While "it is possible to draw a strong inference of corporate scienter without being able to name the individuals" who engaged in the fraud, such findings are reserved for statements "'so "dramatic" . . .  that they 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading.'" *Lachman*, 487 F. Supp. 3d at 139. Such an "exceedingly rare instance[]" of fraud is not pled here. *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020).

[26] The CAC also omits that the Company's independent public accounting firm certified its financial statements for the two fiscal years at issue (Ex. T), further weighing against any inference of scienter. *See Iconix*, 2017 WL 4898228, at *19 ("[T]he fact that [an independent accounting firm] did not detect, observe, or otherwise note any improprieties in [defendants'] financial accounting" undermined any inference of scienter).

*X Fin.*, 2022 WL 765417, at *12 (E.D.N.Y. Mar. 13, 2022). Because Plaintiffs fail to plead "an underlying violation of the Exchange Act" or culpable participation, this claim fails as well.

<u>**CONCLUSION**</u>

The CAC merely parrots an unproven and demonstrably misleading short-seller report, and in so doing falls far short of the PSRLA's demanding standards. The defects in Plaintiffs' pleading are both fundamental and incurable. Accordingly, Defendants respectfully request that the Court dismiss the CAC in its entirety with prejudice.

Dated: New York, New York
　　　June 27, 2022

　　　　　　　　　　　　　　　　/s/ Alexander C. Drylewski
　　　　　　　　　　　　　　　　Alexander C. Drylewski
　　　　　　　　　　　　　　　　William J. O'Brien
　　　　　　　　　　　　　　　　SKADDEN, ARPS, SLATE,
　　　　　　　　　　　　　　　　　　MEAGHER & FLOM LLP
　　　　　　　　　　　　　　　　One Manhattan West
　　　　　　　　　　　　　　　　New York, NY 10001
　　　　　　　　　　　　　　　　Phone: (212) 735-3000
　　　　　　　　　　　　　　　　Fax: (212) 735-2000
　　　　　　　　　　　　　　　　alexander.drylewski@skadden.com
　　　　　　　　　　　　　　　　william.obrien@skadden.com

　　　　　　　　　　　　　　　　*Counsel for Defendants*