UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KISHORE NATH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIGHTSPEED COMMERCE INC., DAX DASILVA, and BRANDON BLAIR NUSSEY,<br><br>Defendants. | Case No. 1:21-cv-06365-BMC |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ....................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................................. 4

III.  ARGUMENT .............................................................................................................. 11

    A.  The Complaint Adequately Alleges Falsity ........................................................... 13

        1.  The Complaint Pleads Actionable Misstatements Regarding Lightspeed's Organic Revenue Growth ...................................................... 14

        2.  The Complaint Pleads Actionable Misstatements Regarding Customer Growth ........................................................................................................ 18

        3.  The Complaint Pleads Actionable Misstatements Regarding the Acquisitions ......................................................................................... 18

    B.  The Complaint Adequately Alleges a Strong Inference of Scienter ..................... 22

        1.  The Complaint Adequately Alleges Defendants' Recklessness ............... 22

            a.  Defendants' Monitoring of Key Metrics Contributes to the Compelling Inference of Scienter ................................................. 23

            b.  Defendants' Access to Information Contributes to the Compelling Inference of Scienter ................................................. 25

            c.  Defendants' Discussion of KPIs and Acquisitions at Regular Meetings Attended By Multiple CWs Supports the Compelling Inference of Scienter ....................................................... 26

        2.  The Complaint Adequately Alleges Motive ........................................... 28

IV.  CONCLUSION ............................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)............................................................................................21

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009)..............................................................................28

*Adler v. Solar Power, Inc.*,
2018 U.S. Dist. LEXIS 54771 (S.D.N.Y. Mar. 30, 2018) ...............................................11

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) .............................................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....................................................................................................12, 22

*Behrendsen v. Yangtze River Port & Logistics, Ltd.*,
2021 U.S. Dist. LEXIS 120264 (E.D.N.Y. June 28, 2021) ..............................................20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................................17, 22

*Blank v. TriPoint Glob. Equities, LLC*,
338 F. Supp. 3d 194 (S.D.N.Y. 2018)..............................................................................28

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002)............................................................................................16

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010).............................................................................23

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).........................................................................15, 19

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010).............................................................................27

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991)..............................................................................................29

*Emps.' Ret. Sys. of Gov.'t of Virginia Islands v. Blanford*,
794 F.3d 297 (2d. Cir. 2015)...........................................................................................25

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................................15

*Galestan v. Onemain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)................................................................................19

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000)..............................................................................................11

*Glob. Network Commc'ns, Inc. v. City of New York*,
   458 F.3d 150 (2d Cir. 2006)..............................................................................................12

*Gordon v. Vanda Pharms. Inc.*,
   2021 U.S. Dist. LEXIS 911755 (E.D.N.Y. Mar. 10, 2021) ...............................................29

*Halperin v. eBanker USA.COM, Inc.*,
   295 F.3d 352 (2d Cir. 2002)..............................................................................................12

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................................................27

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................................26

*In re Avon Sec. Litig.*,
   2019 U.S. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019)........................................................21

*In re Eletrobras Sec. Litig.*,
   245 F.Supp.3d 450 (S.D.N.Y. 2017)............................................................................14, 26

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)................................................................................21

*In re Forest Labs. Sec. Litig.*,
   2006 U.S. Dist. LEXIS 97475 (S.D.N.Y. July 19, 2006) ..................................................22

*In re Glob. Brokerage*,
   2019 U.S. Dist. LEXIS 54506 (S.D.N.Y. Mar. 28, 2019) .................................................14

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2021 U.S. Dist. LEXIS 188672 (S.D.N.Y. Sep. 30, 2021)................................................17

*In re Longtop Fin. Techs. Ltd.*,
   2012 U.S. Dist. LEXIS 91004 (S.D.N.Y. June 28, 2012)..................................................15

*In re Mylan N.V. Sec. Litig.*,
   2018 U.S. Dist. LEXIS 52084 (S.D.N.Y. Mar. 28, 2018) .................................................25

iii

*In re Romeo Power Sec. Litig.*,
    2022 U.S. Dist. LEXIS 99005 (S.D.N.Y. June 2, 2022)............................................................4

*In re Salix Pharms., Ltd.*,
    2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016)..................................................22, 25

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................................................12, 28

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ...........................................................................................22

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..................................................................................................13

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp.2d 512 (S.D.N.Y. Feb. 17, 2011).......................................................................20

*In re Zyprexa Prods. Liab. Litig.*,
    549 F. Supp. 2d 496 (E.D.N.Y. 2008) ...................................................................................11

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)............................................................................................23, 26

*Isakov v. Ernst & Young, Ltd. (Bermuda)*,
    2012 U.S. Dist. LEXIS 37534 (D. Conn. Mar. 19, 2012)......................................................22

*Kaltman v. Key Energy Servs., Inc.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006)..................................................................................15

*Loreley Fin. (Jersey) No. 3 v. Wells Fargo*,
    797 F.3d 160 (2d Cir. 2015)..................................................................................................23

*Manavazian v. ATec Grp., Inc.*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...................................................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................................................................22

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)............................................................................................16, 19

*Micholle v. Ophthotech Corp.*,
    2019 U.S. Dist. LEXIS 160131 (S.D.N.Y. Sep. 18, 2019)......................................................5

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................................12, 13, 27

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ........................................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*,
   575 U.S. 175 (2015).............................................................................................21

*Pirnik v Fiat Chrysler Autos.*,
   2016 U.S. Dist. LEXIS 138439 (S.D.N.Y. Oct. 5, 2016) ....................................22

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.
   Arbitron Inc.*,
   741 F. Supp. 2d 474 (S.D.N.Y. 2010)..................................................................24

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)....................................................................26

*Rosen v. Textron, Inc.*,
   321 F. Supp. 2d 308 (D.R.I. 2004).......................................................................15

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...............................................................................24

*SEC v. Pirate Investor LLC*,
   580 F.3d 233 (4th Cir. 2009) ...............................................................................26

*Shaw, v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996).................................................................................20

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   417 F. Supp. 3d 379 (S.D.N.Y. 2019)..................................................................12

*Speakes v. Taro Pharm. Indus.*,
   2018 U.S. Dist. LEXIS 163281 (S.D.N.Y. Sep. 24, 2018)..................................27

*Swanson v. Interface, Inc.*,
   2022 U.S. Dist. LEXIS 100506 (E.D.N.Y. June 5, 2022) ...................................14

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008).................................................................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)........................................................................................22, 28

*Yannes v. SCWorx Corp.*,
   2021 U.S. Dist. LEXIS 116330 (S.D.N.Y. June 21, 2021)..................................28

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ...............................................................................26

**Statutes**

15 U.S.C. 78j(b) ................................................................................................................... *passim*

15 U.S.C. 78t(a) ...............................................................................................................................28

15 U.S.C. §78u-4 .................................................................................................12, 13, 20, 22

**Rules and Regulations**

17 C.F.R. §240.10b-5(b) .................................................................................................11, 12

Fed. R. Civ. P. 9(b) ........................................................................................................12, 22

Fed. R. Civ. P. 12(b)(6)..................................................................................................12

## I.    PRELIMINARY STATEMENT[1]

Lightspeed Commerce Inc. ("Lightspeed") ***has never earned a profit***.  During the Class Period, investors therefore had to focus on other metrics that the Company emphasized as strong indicators of Lightspeed's success, like *organic*[2] revenue growth and customer location count.  The Company averred that its "*main* sources of revenue are subscriptions for its [commerce enabling software] platforms"[3] and that it also earns processing and transaction fees generated by its payment services (collectively, "software and payments revenue").  Defendants have always underscored Lightspeed's *organic* growth strategy, complemented by a separate acquisition strategy, and emphasized the significance of its customer location count metric, calling it a "key performance indicator" because the "ability to increase the number of customer locations served by our platforms is an indicator of our success in terms of market penetration and growth of our business." In particular, Defendants made clear that *organic* customer location growth in particular is "one of the *most important* metrics for us" and a "*primary driver* of our business model."

Against that backdrop, Defendants issued misleading statements throughout the Class Period designed to mask the Company's struggles to grow organically.  To combat those struggles, Lightspeed embarked on an acquisition spree, acquiring ShopKeep Inc. ("ShopKeep"), Upserve Inc. ("Upserve"), and Vend Limited ("Vend") during the Class Period for *over a billion dollars* collectively, for the undisclosed primary purpose of inflating Lightspeed's customer count and subscription revenue to portray *organic* growth at "record" rates that had no basis in reality.  In reality, Defendants *bought in* much of what they reported as massive organic software and payments growth rates and customer location growth during the Class Period.  Indeed, when the

---

[1] "¶ _" refers to the Amended Class Action Complaint, filed on April 27, 2022, ECF No. 33 ("Complaint").
[2] "Organic" growth is growth that is not achieved via acquisition.
[3] All quoted statements are cited in the Statement of Facts ("SOF"), Section II below.

three acquisitions' contributions to subscription revenue (which includes deferred revenue and trade receivables) are backed out for the third quarter of 2021 (ended December 30, 2020), during which Lightspeed consummated the ShopKeep and Upserve acquisitions, and the first quarter of 2022 (ended June 30, 2021), during which Lightspeed consummated the Vend acquisition, Lightspeed is left with double digit declines.  Indeed, multiple confidential witnesses ("CWs") described with particularity in the Complaint, all of whom worked at Lightspeed during the Class Period and who corroborated one another, substantiated that Defendants touted the acquisitions internally for their additions to the Company's customer count, and made no effort at actually integrating any of the acquiree's functionality or technology into Lightspeed during the Class Period (despite Defendants' representations regarding integration to the contrary).

The Complaint adequately alleges a compelling inference of scienter as to both CEO Defendant Dasilva and CFO Defendant Nussey, which is thereby imputed to corporate Defendant Lightspeed.  These allegations include, *inter alia*, Defendants' representations that they monitored organic customer count, which they called a key performance indicator and one of Lightspeed's "most important metrics; Defendants' representations that Lightspeed has never earned a profit and that subscription-based revenue is the Company's main revenue source; Defendants' contemporaneous access to the Company's key metrics data via platforms including Salesforce, Looker, and RAD; Defendants' admissions at regularly held internal meetings (attended by multiple CWs) that they pursued the acquisitions to increase customer count; Defendants' detailed statements during earnings calls putting themselves forth as intimately knowledgeable regarding the acquisitions, and specific metrics such as customer location count and organic revenue growth; Defendants' certifications with each quarterly filing that they had "exercised reasonable diligence" to confirm their accuracy; and Defendant Dasilva's stock sale proceeds of approximately $42

million during the Class Period.  These allegations considered holistically as the Supreme Court requires, many of which Defendants do not contest, create an inference of scienter that is at least as compelling as any opposing inference.  Defendants also do not challenge and thus concede that Plaintiff has satisfied the remaining elements of the Section 10(b) claim.

Defendants cannot escape liability simply by pointing out that a Spruce Point Capital Management short seller report ("Report") served as a corrective disclosure.[4]  The Report is not authored by some anonymous short seller but is authored by Ben Axler, who has extensive credentials and a proven history of uncovering fraud. ¶ 92. Regardless, the Complaint does not "ride the coattails" of the Report as Defendants baselessly argue. Def. Br. at 1. The Complaint makes clear that it is the result of, *inter alia,* Plaintiff's own comprehensive investigation, research, analyses replicating and validating the contents of the Report, and interviews of numerous former employees who corroborate one another's statements. ¶ 21. Indeed, while Defendants try to deflate the scathing conclusions of the Report by harping on Spruce Point's short position in Lightspeed stock, they conveniently fail to mention that *Lightspeed's own quarterly report for the second quarter of 2022 ended September 30 2021, issued slightly over a month after the Report, confirmed the conclusions in the Report that Defendants had massively overstated Lightspeed's customer growth and misled the market regarding its organic revenue growth.*

---

[4] Defendants have not requested nor provided any basis for this Court to take judicial notice of a Bloomberg article they cite regarding a DOJ inquiry into certain short-seller firms. Def. Br. at 1.  At minimum, the Court cannot consider the article for the truth of matters asserted therein.  In any event, there is no substantive discussion of, or indication of wrongdoing by Spruce Point in the article, which in fact states that many of the short sellers they list in the article had not actually been contacted by investigators.

## II.   STATEMENT OF FACTS

Lightspeed provides commerce-enabling software as a service (SaaS) platforms for small and midsize businesses. ¶ 19. The Company has said that its cloud platform functionalities include full omni-channel capabilities[5], order-ahead and curbside pickup, point of sale, product and menu management, employee and inventory management, analytics and reporting, multi-location connectivity, loyalty, customer management, and tailored financial solutions. *Id.*  Lightspeed earns most of its revenue from "software and payments revenue," which is made up of: 1) *subscription-based revenue* from the sale of subscription licenses to its retail and hospitality software solutions, which generates deferred revenue and trade receivables; and 2) *transaction-based revenue* in the form of payment processing fees and transaction fees earned by providing customers with the functionality to accept payments from consumers.  Defendants have stated, however, that "[t]he Company's *main sources of revenue are subscriptions* for its platforms." *See, e.g.,* Ex.[6] P-A, at 10; Ex. P-B, pages 3, 28.

***The Company has never earned a profit***.  Defendants therefore emphasize other metrics such as organic revenue and customer base growth in reporting to investors on Lightspeed's business. Defendants state in their SEC filings that their strategy is to grow organically, and to complement that strategy with growth via acquisitions.  They make clear that "customer locations" is a "Key Performance Indicator" ("KPI") and have stated that the Company's "ability to increase the number of Customer Locations served by our platforms is an ***indicator of our success in terms***

---

[5] "Omni-channel" is a business that integrates different methods of shopping for its consumers, *e.g.*, online, phone, and physical store.

[6] "Ex. _" references are exhibits to the Declaration of Tamar A. Weinrib ("Weinrib Decl."), filed concurrently herewith.  Exs. P-A-P-C, P-G, P-H, and P-L to the Weinrib Decl. are SEC filings of which the Court can take judicial notice as they are either referenced in the Complaint or filed publicly with the SEC. *See, e.g., In re Romeo Power Sec. Litig.*, 2022 U.S. Dist. LEXIS 99005, at *2 n.1 (S.D.N.Y. June 2, 2022)("Plaintiffs' unopposed request for judicial notice of certain documents is granted because they were either publicly filed with the SEC or incorporated by reference in the Complaint.").

*of market penetration and growth of our business*.” Defs. Ex.[7] B, at 5; Defs. Ex. D, at 7; Defs. Ex. E, at 5; Ex. P-B, at 5.  Defendants have explained that “*organic customer location adds*” in particular “is one of the *most important metrics* for [Lightspeed].” ¶ 70.

## Defendants Mask Declining Organic Growth[8]

Throughout the Class Period Defendants misled investors by concealing that they embarked on an acquisition spree to mask a decline in organic growth and by misstating Lightspeed’s organic software and payments revenue growth and customer base growth as follows:

In a press release issued on November 5, 2020 announcing results for the quarter ended September 30, 2020 (“2Q21”), Defendants touted Lightspeed’s customer base growth of 68% year-over-year and 26% quarter-over-quarter, explaining that “*new customer location additions* continues to be an *encouraging metric* and *suggests a strong long-term outlook*.” Ex. P-C.  On an earnings call that same day, Defendant Nussey reiterated Lightspeed’s “*surge of gross new customer location additions*” and confirmed, “as I mentioned last quarter, *this metric is the most encouraging thing we can see*…” Ex. P-D, at 5.[9]  On the same call, Defendant Dasilva also emphasized customer growth, detailing “software and payments growth of 62%, *aided by a growing customer base*… Also that same day, Lightspeed issued another press release to announce the ShopKeep acquisition, wherein Defendants listed the advantages of the deal, stating that it “reinforces Lightspeed’s status as a clear category leader,” “immediately expands Lightspeed’s U.S. market share, allowing for increased investment in sales, marketing, and research and development to capitalize on the increasing demand for modern, cloud-based, omni-channel

---

[7] “Defs. Ex. _” references are exhibits to the Declaration of Alexander C. Drylewski, ECF. No. 37.

[8] After further consideration and analysis, Plaintiff will only pursue its claims as to misstatements regarding Lightspeed’s growing customer base, organic software and payments revenue growth, and the ShopKeep, Upserve, and Vend acquisitions, as set forth in the SOF herein.

[9] Exs. P-D-P-F, and P-K are transcripts of quarterly earnings calls of which the Court can take judicial notice. *See Micholle v. Ophthotech Corp.,* 2019 U.S. Dist. LEXIS 160131, at *27 n.11 (S.D.N.Y. Sep. 18, 2019).

commerce solutions." ¶ 58. Defendants once again *touted the total number of Lightspeed's customer locations*, reminding investors that it is a KPI. *Id.*

Less than a month later, on December 1, 2020, Defendants issued a press release announcing that they had acquired Upserve for the purported purpose of "accelerat[ing] product innovation and the advancement of Lightspeed's analytics-driven commerce platform" ¶ 65. Again, Defendants touted its customer location growth, reminding investors that it is a KPI.

Then, on February 4, 2021, Defendants issued a press release announcing results for the third quarter of 2021 ("3Q21") wherein Defendant Nussey stated that, "[*d*]*espite the challenges we continue to face as a result of the pandemic, Lightspeed was able to grow revenues, expand our customer base,* deliver highly innovative new offerings and complete two transformational acquisitions." ¶ 67. On an earnings call the same day, Defendant Nussey touted the "*continued growth of our customer base*," as a "*primary driver*[] of our business model" and stated, "[*w*]*e saw another strong quarter of organic customer location adds, which I believe is one of the most important metrics for us.*" ¶ 70. During that same call, Defendant Dasilva emphasized that, "[a]lthough the addition of Upserve and ShopKeep boosted our performance for the quarter, *even without their contribution*, Lightspeed delivered revenue ahead of our previously established guidance and *reached Software and Payments organic revenue growth of 47% year-over-year, accelerating from the 42% we saw last quarter*." This included subscription revenue made up of $44 million in deferred revenue and $9.8 million in trade receivables. ¶¶ 36, 67.

On March 11, 2021, Lightspeed issued a press release announcing it would acquire Vend, for the purported purpose of "leverage[ing] Vend's complementary modern technology stack and user experience capabilities…"

Throughout the Class Period, Defendants claimed to be actively integrating the acquisitions, *see, e.g.,* ¶¶ 55, 69.

In a press release issued May 20, 2021 announcing results for the quarter and full year ended March 31, 2021 ("4Q21"), Defendants stated that, "[f]or the year, subscription revenue grew to $119.3 million, an increase of 51%, ***largely due to strong organic growth***." ¶¶ 75-77; Defs. Ex. D, at 2. Defendants further represented that, "[s]oftware revenue also pushed higher thanks to existing customers adopting a greater number of software modules and a ***growing customer base.***" ¶ 74. On an earnings call the same day, Defendant Dasilva touted "***organic software and transaction-based revenue growth of 48%.***" Ex. P-E.

In an earnings call on August 5, 2021, Defendant Nussey touted a "record quarter for new customer location additions, which were over 60% higher than a year ago *organically*." Ex. P-F. Defendant Nussey went on to say that, "as we sit here today, we're really comfortable with the progress we're making on growing market share and ***we take a look at the rates we're growing the customer base and the size of our market,*** we remain really optimistic there. ***We've been growing...***" Touting the Company's organic growth, Defendant Nussey stated that, "***On an organic basis, Software and Payments grew 78% year-over-year***." That growth included Defendants' reported net $13.4 million in trade receivables. Defs. Ex. N, at 11.

Defendants' Class Period statements misled investors because, in reality, to conceal a decline in organic growth, Lightspeed spent *over a billion dollars* to acquire ShopKeep, Upserve, and Vend, to increase its customer count and inflate its software and payments revenue.[10] ¶ 35.

---

[10] Indeed though Defendants claimed they engaged in acquisitions only with "high growth companies" to expand Lightspeed's geographic footprint, expand into "compelling verticals," and advance its technology offering, *see, e.g.,* ¶¶ 55, 63, 69, each target company suffered financial woes at the time of the acquisitions (ShopKeep was near bankruptcy and had limited growth; Upserve's business was in decline; and Vend was falling severely short of its financial expectations.) *Id.,* ¶¶ 38-43. This supports the contention that Defendants pursued these transactions for the purpose of boosting customer counts and revenue growth, to mask organic declines. Further supporting this contention is that while Defendants claimed to be actively integrating their acquisitions, *see, e.g.,* ¶¶ 55, 69, multiple CWs Plaintiff

Specifically, while touting customer base growth and organic software and payments revenue growth they failed to reveal that: 1) they achieved their customer base growth primarily via acquisition rather than organically and that once the acquisition spree ceased, customer growth would decelerate; 2) though touting 47% organic software and payments revenue growth for 3Q21, without the ShopKeep and Upserve acquisitions, organic deferred revenue and trade receivables (*i.e.* subscription revenue, the Company's self-proclaimed primary source of revenue) in fact declined by double digits that quarter; and 3) though touting 78% organic revenue growth for 1Q22, without the Vend acquisition's contribution, organic trade receivables in fact declined substantially.

Indeed, multiple CWs that Plaintiff interviewed, corroborating one another, stated that despite publicly touting enhanced functionality and technology as advantages to the ShopKeep, Upserve, and Vend acquisitions, *see, e.g.,* ¶¶ 58, 60, 65, 72, Defendants pursued them to increase Lightspeed's customer count and combat a decline in organic growth, a fact Defendants Dasilva and Nussey admitted during internal weekly town hall meetings. ¶¶ 38-43. CW5 additionally stated that Lightspeed's key business metrics (which according to Defendants includes customer location count) are "smoke and mirrors." ¶ 24.

Regarding Defendants' claims of organic software and payments revenue growth, a balance sheet allocation analysis for 3Q21 and 1Q22 reveals that despite representations of strong organic *growth*, organic deferred revenue and trade receivables in fact *declined*. First, in 3Q21, Lightspeed consummated the ShopKeep and Upserve acquisitions for $545 million and $412 million respectively. *Id.* Backing out each acquisition's contributions to deferred revenue and receivables reveals evidence of double digit declining organic growth, which directly contradicts

---

interviewed made clear that in fact they had made no effort at integration and did not leverage the target companies' technology and functionality. ¶¶ 38-43.

Defendants' claims of 47% organic software and payments revenue growth on the February 4, 2021 conference call for 3Q21. Moreover, while touting Lightspeed's organic growth on the August 5, 2021 conference call for 1Q22, Defendants failed to reveal that without the contribution of receivables to its balance sheet from the Vend acquisition, which closed for $372 million that same quarter, Lightspeed's receivables in fact declined quarter-over-quarter by 20%. ¶ 37.

**The Truth Emerges**

On September 29, 2021, research firm Spruce Point Capital Management ("Spruce") published a scathing 125- page report authored by Ben Axler[11] (the "Report") based on extensive research into non-public and obfuscated information, and which performed analyses not previously done by any other market participant. ¶¶ 85-88. "After conducting a forensic financial and accounting review," the Report characterized Lightspeed as "a cash degenerative North American roll-up of point-of-sale commerce solutions" that "***covered up massive inflation of its …customer counts…***," and that "cover[ed] up increasing competitive pressures and ***double digit organic declines in its business with a flurry of acquisitions***." *Id*., Defs. Ex. A.

Regarding customer counts, the Report stated, "[w]e find ***irrefutable evidence*** that LSPD ***overstated its customer count by 85%***." *Id.* The Report also revealed for the first time that Lightspeed pursued the ShopKeep, Upserve, and Vend acquisitions to mask a decline in organic growth. *Id.* Specifically, the Report revealed that while the Company claimed 47% in organic software and payments revenue growth for 3Q21, organic deferred revenue and trade receivables growth actually declined by double digits when the ShopKeep and Upserve's contributions to these metrics are "backed out." *Id.* Moreover, the Report uncovered that for Q122, while Lightspeed

---

[11] Mr. Axler's extensive credentials and background in forensic financial research and expertise exposing over $1 billion in fraud by publicly listed companies is detailed in the Complaint, ¶ 92.

9

again touted "strong organic growth," when Spruce backed out the revenue contributed by the Vend acquisition, organic trade receivables actually "declined quarter-over quarter by 20%." *Id.*

Lightspeed issued a press release denying the Report's revelations by stating in a conclusory fashion that it "contains numerous important inaccuracies and mischaracterizations," but failing to identify a single one.  Ex. P-G.  Instead, Defendants touted "organic software and transaction-based revenue growth of 78%," explained that references to "organic" growth "exclude the impact of any acquisitions that occurred since the end of the prior comparable period," and concluded by stating that, "[t]he Company will not be providing further comment on the report at this time..." Shocked by the Report and the Company's lack of meaningful response, Lightspeed stock plunged almost $14 a share from its close of $112.50 per share on September 28th to close at $98.77 per share on September 29th, on unusually high volume of more than 7 million shares trading, or more than 6x the average daily volume over the preceding ten trading days. ¶ 90.

Then just a little over a month later, on November 4, 2021, before the opening of trading, Lightspeed issued a press release announcing its second quarter 2022 ("2Q22") financial results for the interim period ended September 30, 2021, *which confirmed the findings of the Report*, and laid the Company's September 29, 2021 denial to rest. Ex. P-H; Defs. Ex. C.  While the Company's fiscal 2Q22 revenue grew 193% on a year-over-year basis to $133.2 million, *a full half of that revenue came from new business acquisitions*, *while organic revenue in its core segments – subscriptions and transaction-based revenue – grew a mere 58% - well below the 78% growth the Company had just touted one month prior in responding to the Report*. *Id.* Additionally, for 2Q22, the Company only reported a sequential organic increase in customer locations of just 2%.  More critically, the Company's guidance for the rest of its fiscal year 2022, ending March 31, 2022 ("FY22") demonstrated that its earlier revenue growth had indeed been

10

driven primarily by the acquisitions as the Report had charged, and that those tailwinds were now rapidly fading.  For its third quarter 2022 ("3Q22"), Lightspeed only forecasted revenues in the range of $140 million to $145 million – or a paltry 7% sequential revenue growth.  *Id.* And for FY22, the Company only guided for revenues of $520 million to $535 million, implying no sequential growth whatsoever in the Company's fourth quarter 2022 ("4Q22"). *Id.* On this news, confirming the findings of the Report and detailing the specific harm to the Company's financial results, Lightspeed stock fell more than $27 per share from its close of $98.97 per share on November 3, 2021 to close at $71.36 per share on November 4, 2021, on unusually high trading volume of more than 13.5 million shares trading, or more than fourteen times the average daily volume over the preceding ten trading days. Ex. P-I.[12]

Analyst BTIG issued a report the next day confirming that "the two areas in which the ompany's 2Q22 print fell short of investor expectations were the ones that the short seller had highlighted as issues," which BTIG identified as "massively overstat[ing] its customer count and…aggressively pitching metrics that exaggerated its growth potential."  BTIG also stated that the Company's "sequential organic increase in customer locations of just 2% during 2Q22 to ~156K was disappointing" and criticized Lightspeed's "inconsistent disclosure of KPIs." Ex. P-J.[13]  Lightspeed stock continued its downward spiral thereafter and now trades at $21.91.[14]

## III.    ARGUMENT

To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material

---

[12] The Court can take judicial notice of Lightspeed's November 4, 2021 stock price decline. *Ganino v. Citizens Utilities Co*., 228 F.3d 154, 167 n.8 (2d Cir. 2000) (a "district court may take judicial notice of well-publicized stock prices"); *Adler v. Solar Power, Inc*., 2018 U.S. Dist. LEXIS 54771, *4 (S.D.N.Y. Mar. 30, 2018) (same).  Should the Court decline to take judicial notice of the stock price decline on November 4, 2021, Plaintiff hereby seeks leave to amend the Complaint accordingly.

[13] "Judicial notice can be taken of …published analyst reports in determining what the market knew." *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008).

[14] LSPD's closing price on August 9, 2022.

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Sjunde AP-Fonden v. Gen. Elec. Co*., 417 F. Supp. 3d 379 , 390 (S.D.N.Y. 2019). Though securities fraud claims are subject to Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading standard, plaintiffs need not plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but merely sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). Within that context, in evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept the truth of the facts alleged and draw all reasonable inferences in Plaintiff's favor. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006). Plaintiffs need only allege "enough facts to state a claim for relief that is plausible on its face[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[15] Rule 10b-5(b) makes it unlawful for a person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). "[T]he materiality of an omission is a mixed question of law and fact, [thus] courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission." *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 356–57 (2d Cir. 2002). The Complaint satisfies the applicable standards. Defendants concede as much as to four elements of the §10(b) claim, only challenging (wrongly) falsity and scienter.

---

[15] Internal citations omitted and emphasis supplied herein unless otherwise indicated.

### A.    The Complaint Adequately Alleges Falsity

To allege an actionable misstatement or omission, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *see also* 15 U.S.C. §78u-4(b)(1).   In addition to prohibiting statements that are outright false, Section 10(b) prohibits "half-truths, or statements that are misleading by omission." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016).

The Complaint satisfies this standard.  As set forth in Section II. above, the Complaint adequately alleges that Defendants Lightspeed, Dasilva and Nussey each made misleading statements in press releases, quarterly and annual financial statements, and on earnings calls touting the growth of Lightspeed's customer base, the growth of its organic software and payments revenue, and the ShopKeep, Upserve, and Vend acquisitions.  The Complaint sufficiently explains that these statements defrauded investors because, in reality, to conceal a decline in *organic* growth, Lightspeed—*a company that has never turned a profit*-- spent *over a billion dollars* to acquire ShopKeep, Upserve, and Vend (all experiencing financial woes at the time of their acquisition), not to enhance Lightspeed's functionality and technology as Defendants claimed, but to increase customer count and inflate software and payments revenue.

Regarding its customer count, Defendants never revealed that adding customers via acquisition masked paltry *organic* customer growth (Defendants identified customer location growth as a KPI , a "primary driver of our busines model," and Defendant Nussey specified that *organic* customer location growth is "one of the most important metrics for us," ¶ 70), and that once the acquisitions stopped, growth would decelerate significantly.  Regarding software and payments revenue, Defendants touted stellar *organic* growth of 47% and 78%  in 3Q21 and 1Q22

13

respectively, without revealing that organic deferred revenue and trade receivables (*i.e.,* "subscription revenue" which the Company stated is its main source of software and payments revenue) actually declined significantly when the acquisitions' contributions to these metrics are backed out. Given allegations that the Company has never earned a profit, that Defendants consistently reiterated its primary strategy of growing organically (and *complementing* that growth with acquisitions), emphasized that organic customer growth is a KPI and one of the most important metrics for Lightspeed, made clear that subscription revenue is a main source of revenue, and spent over a billion dollars in acquisitions, the Complaint adequately demonstrates a "'substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available,'" and thus adequately pleads falsity. *See Swanson v. Interface, Inc.*, 2022 U.S. Dist. LEXIS 100506, at *2 (E.D.N.Y. June 5, 2022)(J. Cogan). Moreover, Defendants' "specific statements" concerned matters that are "central to its financial condition" and are thus actionable. *In re Eletrobras Sec. Litig.*, 245 F.Supp.3d 450, 463 (S.D.N.Y. 2017); *In re Glob. Brokerage*, 2019 U.S. Dist. LEXIS 54506, at *31 (S.D.N.Y. Mar. 28, 2019) (statements in which "FXCM portrayed its agency-trading model as 'fundamental to [its] core business philosophy'" were actionable).

### 1. The Complaint Pleads Actionable Misstatements Regarding Lightspeed's Organic Revenue Growth

The Complaint sets forth precisely how Defendants misled investors by claiming organic *software and payments revenue* growth of 47% in 3Q21 and 78% in 1Q22. Specifically, utilizing precise metrics, the Complaint alleges that when ShopKeep and Upserve's contributions to organic deferred revenue and organic trade receivables growth are removed from the calculation for 3Q21, what remains is a double digit organic decline for both, and that when Vend's contribution to organic trade receivables is removed from the calculation for 1Q22, what remains is a 20% decline

quarter-over-quarter[16]. ¶¶ 36-37[17]. Defendants' misstatements concealed Lightspeed's struggles to grow organically and are thus actionable. *See, e.g., Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010)(finding statements regarding "organic growth" actionable because defendants gave investors the impression that the company's percentage of organic loans versus purchased loans was larger than the reality); *In re Longtop Fin. Techs. Ltd.*, 2012 U.S. Dist. LEXIS 91004, at \*35 (S.D.N.Y. June 28, 2012)(finding statements that "'organic business expansion' and acquisitions were behind the company's growth" actionable because "the Lead plaintiffs' allegations raise a strong inference that the rationales given to the public and the SEC to *explain* Longtop's growth were false").[18]

Unable to dispute these calculations, Defendants instead seek to distract and befuddle. Defendants begin with the misleading argument that organic deferred revenue and organic trade receivables are a "different metric" from organic software and payments revenue. As they explain in their filings, (*see* Section II. above), Defendants earn most of their revenue from "software and payments revenue," which is made up of both "subscription revenue" and "transaction based revenue." As Defendants concede in their motion, "subscription revenue" *includes deferred revenue and trade receivables.* Def. Br. at 21. Lightspeed has made clear that "[t]he Company's main sources of revenue are **subscriptions** for its platforms." *See, e.g.,* Ex. P-A, at 10. As such, in

---

[16] Characterizing these double digit declines, which Defendants do not dispute, as "incremental" does not make it so. Def. Br. At 22.

[17] As the Complaint alleges, Plaintiff replicated and validated this analysis, not relying solely on the Report as Defendants claim (Def. Br. at 20, 22).

[18] *See also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.,* 450 F. Supp. 3d 379, 413 (S.D.N.Y. 2020)(finding statements regarding financial data "materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically"); *Kaltman v. Key Energy Servs., Inc.,* 447 F. Supp. 2d 648, 661-62 (W.D. Tex. 2006) (company "is in an excellent financial position" and has ability to execute "plan for organic growth" are actionable); *Rosen v. Textron, Inc.,* 321 F. Supp. 2d 308, 320 (D.R.I. 2004) ("I see an even stronger organic growth story as we move forward because our businesses have gained a lot of momentum" was materially misleading); *Manavazian v. ATec Grp., Inc.,* 160 F. Supp. 2d 468, 480-81 (E.D.N.Y. 2001) (statements that business scheme was "framework" for "organic growth" and "blueprint" for "hyper-growth"; and company was "poised for future growth" and occupied a "strategic position in the technology industry" were actionable).

touting organic software and payment revenue growth at astronomical rates, Defendants incurred a duty to disclose that without the contribution to *subscription* revenue from the three companies they acquired for over a billion dollars collectively in those two quarters, organic subscription growth actually *declined. See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). In other words, once Defendants chose to speak, the had a duty to tell investors the whole truth. *Id.; see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues").

Next, without any support and belying the plain language of their disclosures, Defendants argue that the 47% organic software and payment growth they touted during the 3Q21 earnings call referred to "transaction-based revenue," *though no such delineation is actually made*. Def. Br. at 4;[19] *see* Ex. P-K. At no point during the 3Q21 earnings call (or in any other 3Q21 disclosure) did Defendants attribute the Company's organic growth to an "increased emphasis" on "transaction-based revenue." Def. Br. at 4.[20] Even accepting Defendants' argument that Lightspeed began to derive "a greater proportion" of its revenue "from transaction-based revenues" that does not negate the falsity of their statements claiming massive *organic software and payments revenue growth.* That is especially so given that subscription revenue still amounted to a larger portion of software and payments revenue than transaction-based revenue. *See* Defs. Ex. B, at 3 ("In Fiscal 2021, subscription revenue and transaction-based revenue accounted for 54% and 37% of our total revenues, respectively.")

Defendants also argue that because they stated in the MD&A for 3Q21 that Lightspeed had

---

[19] Indeed, Defendants also concede that they did not begin to report transaction based revenue separately until 4Q421, Def. Br. at 7.

[20] What the 3Q 2021 MD&A states is the Company's belief that "transaction-based revenues will continue to represent an increasing proportion of our overall revenue mix *over time as a result of the <u>recent</u> introduction of Lightspeed Payments.*" It did not state that they based the purported 47% in organic growth on an "increased emphasis" on transaction-based revenue.

"become more accommodating of monthly payment plans for our customers aimed in part to encourage adoption of Lightspeed Payments," that investors should have read past their lofty 47% organic growth hype (which even in their Motion they call "record" growth) and somehow deduced that organic deferred revenue and trade receivables had declined substantially when removing the impact of the acquisitions. Def. Br. at 21. Yet, *in the very same MD&A*, Defendants assured investors that despite the COVID-19 pandemic, "the results still demonstrate growth in the quarter ended December 31, 2020, ***due to increases in subscription revenue…***" Ex. P-B, at 24.  While Defendants generically acknowledged the ShopKeep and Upserve acquisitions when discussing the subscription revenue increase for 3Q21, at no point did they reveal that without those acquisitions, *organic* subscription revenue had in fact declined significantly that quarter. *Id.*

The only argument Defendants proffer as to their misstatement of organic software and payments revenue in 1Q22 is a factual argument that is inappropriate for consideration at the pleading stage.  *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2021 U.S. Dist. LEXIS 188672, at \*9 (S.D.N.Y. Sep. 30, 2021) ("The flaw in this argument, as [Plaintiff] rightly points out, is that the Court may not consider [Defendant's] asserted 'facts' at the motion to dismiss stage."). Asking the Court to flout the Supreme Court's directive that on a 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiffs' favor, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and making an argument that would require the Court to draw a factual inference in their favor, Defendants argue that Vend's "trade receivables and other assets" is not comparable to what Lightspeed reported as its "total trade receivables," *even though the 1Q22 financial statement does not define or distinguish the two*. Then, without citation to a single SEC filing, Defendants make the same argument in a conclusory footnote asking the Court to make that same inappropriate factual inference in their favor as to their misstatements

17

for 3Q21. Def. Br. at 23, fn. 15.

### 2. The Complaint Pleads Actionable Misstatements Regarding Customer Growth

In the section of their Motion dedicated to defending against allegations of "misstatements concerning customer locations," Def. Br. at 16, Defendants do not proffer a single argument addressing any of the alleged misleading statements regarding Lightspeed's customer base growth set forth in the Complaint that are repeated in the SOF herein. *See* Section II. above. They thus waive any challenge to and concede the falsity of those statements. In any event, the Complaint adequately alleges that Defendants each made statements during the Class Period touting the growth of Lightspeed's customer base, emphasizing that customer location growth is a KPI, a "primary driver of our business model," and that "*organic* customer location adds" in particular are "one of the most important metrics for us," and further alleges that these statements misled investors because Defendants failed to reveal that they achieved customer growth primarily via acquisition rather than organically, and that once the acquisition spree ceased, customer growth would decelerate. Not only did the Report reveal the falsity of Defendants' statements based on "irrefutable evidence" that indeed, Defendants had massively overstated their customer count, but the Company's own filing for 2Q22 filed on November 4, 2021 confirmed that with the ShopKeep, Upserve and Vend acquisitions behind them, Lightspeed only had sequential organic increase in customer locations of a paltry 2%. These allegations demonstrate the falsity of Defendants' statements.

### 3. The Complaint Pleads Actionable Misstatements Regarding the Acquisitions

When Defendants announced their acquisitions of ShopKeep, Upserve and Vend, they listed specific reasons why Lightspeed pursued those acquisitions, *e.g.,* "reinforc[ing] Lightspeed's status as clear category leader," "allowing for increased investment in sales,

18

marketing, and research and development," "accelerat[ing] product innovation," and "leverage[ing] …complementary modern technology," among others.  These are not simply "optimistic projections" that are "too vague to be actionable" as Defendants argue. Def. Br. at 24; *see e.g., Galestan v. Onemain Holdings, Inc*., 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) ("statements are not puffery when they constitute 'misrepresentations of existing facts'"). They are statements of current fact as to Defendants' purported reasoning *at the time* for pursuing the transactions.  The Complaint alleges that these statements were "contemporaneously false" because Defendants pursued the transactions for the purpose of masking Lightspeed's struggles with organic growth by inflating revenue numbers and customer count, and thus did not "genuinely and reasonably" believe their statements when made. Def. Br. at 24.  However, even if they did believe their statements, that does not render them any less actionable as they were incomplete. At minimum, Defendants' statements triggered a duty to reveal that another (indeed, primary) reason for the acquisitions was to make Lightspeed's organic customer count growth (a KPI and self-identified "most important metric") and organic subscription revenue (self-identified as the main source of Lightspeed's revenue) appear larger than the reality. *See Meyer*, 761 F.3d at 250.[21]

That Defendants embarked on their acquisition spree for the primary purpose of masking a decline in Lightspeed's organic growth is supported by allegations that they pursued companies that had financial woes, ¶ 35, and then failed to integrate them post-acquisition, as multiple CWs corroborated. ¶¶ 38-43.  As such, Defendants' representations that they were actively integrating the acquisitions during the Class Period also misled investors.[22] *See City of Omaha Police & Fire*

---

[21] Likewise, in *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019), the Ninth Circuit held that plaintiffs "adequately alleged falsity" because defendants misled investors when they chose to "tout their products' capabilities" but did not disclose "adverse information that cuts against the positive information."

[22] Defendants cannot counter the fact they failed to integrate their acquisitions during the Class Period by citing a disclosure that post-dates the Class Period by *eight months,* Def. Br. at 26, fn. 18, and which raises a factual argument inappropriate for adjudication at this stage.

*Ret. Sys.*, 450 F. Supp. 3d at 411 (finding defendants' statements regarding integration of acquisitions actionable based on CW statements that the company had integration problems).

Moreover, multiple CWs corroborated that despite publicly touting enhanced functionality and technology as advantages to these acquisitions, *see, e.g.,* ¶¶ 58, 60, 65, 72, Defendants Dasilva and Nussey admitted during internal weekly town hall meetings that they pursued the acquisitions to increase Lightspeed's customer count. ¶¶ 38-43. In other words, the Complaint provides more than a "shred of support" (Def. Br. at 25) for the allegation that Defendants paid over a billion dollars for the acquisitions in order to artificially boost "organic" metrics that they told investors demonstrated key indicators of Lightspeed's success.

Defendants' statements regarding their *current* purposes for pursuing acquisitions and *current* integration efforts are not protected under the PSLRA's safe harbor doctrine because they are not forward-looking and were not accompanied by meaningful cautionary language. *See Behrendsen v. Yangtze River Port & Logistics, Ltd.*, 2021 U.S. Dist. LEXIS 120264, at *22 (E.D.N.Y. June 28, 2021). *See also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. Feb. 17, 2011)(noting that the PSLRA "does not protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the time they are made, simply because the statements are couched as predictions of future events[]"); *Shaw, v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996) (holding that when a false statement "has both a forward-looking aspect and an aspect that encompasses a representation of present fact," the bespeaks caution doctrine does not apply). Warning that acquisitions "could divert management's attention" or "disrupt our operations" bear no relevance to the Complaint's allegations that Defendants pursued the acquisitions to mask struggles with the Company's organic growth. Def. Br. at 27. For warnings to be meaningful, they

20

must relate to the alleged subject of Defendant's misleading statements. *In re Facebook, Inc. IPO Sec. & Derivative Litig.* 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) ("To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil'"). Moreover, warning that they *might* have "difficulty integrating" acquisitions does not caution investors that Defendants were not actively integrating the acquisitions at all during the Class Period, because they did not need to do so to effectuate their primary purpose in acquiring those companies. *Id.* at 516 ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized").

Defendants also cannot evade liability by arguing that stating integration efforts "are well under way" is merely an expression of belief. Def. Br. at 29. This is a statement of fact that is not couched as a statement of belief. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176-77 (2d Cir. 2020). Moreover, Defendants could not have reasonably believed that integration efforts were well underway at a time where there were no active integration efforts. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*, 575 U.S. 175, 186, 194 (2015) (holding that opinions are actionable if (1) "the speaker did not hold the belief," (2) "the supporting fact[s]" are untrue, or (3) if "the speaker omit[ted] information" that "makes the []statement [] misleading to a reasonable [investor.]"); *see also In re Avon Sec. Litig.*, 2019 U.S. LEXIS 200816, at *49 (S.D.N.Y. Nov. 18, 2019) (holding beliefs are irrelevant when statements conflict with omitted information).

Additionally, Defendants' statements listing the purported purposes for the acquisitions are not inactionable statements of belief, regardless of whether they genuinely thought their stated expectations for the acquisitions would transpire (Def. Br. at 29), because the Complaint alleges that those statements misled investors by concealing the true purpose for the acquisitions. In other

21

words, the Complaint alleges that Defendants did not genuinely believe that their disclosures stated the true motivation behind their acquisition spree.

### B.    The Complaint Adequately Alleges a Strong Inference of Scienter

The scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). It need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). Even if a plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation, "the tie . . . goes to the plaintiff." *In re Salix Pharms., Ltd.*, 2016 U.S. Dist. LEXIS 54202, at *40 (S.D.N.Y. Apr. 22, 2016). While scienter must be pled with particularity, "[n]either *Iqbal*, *Twombly*, Rule 9(b), nor the PSLRA require detailed factual allegations." *Isakov v. Ernst & Young, Ltd. (Bermuda),* 2012 U.S. Dist. LEXIS 37534, at *13 (D. Conn. Mar. 19, 2012).  The test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter ...." *Tellabs,* 551 U.S. at 322-23  (emphasis in original).  When considered holistically, the Complaint's allegations plead a strong inference of scienter.

### 1.    The Complaint Adequately Alleges Defendants' Recklessness

Recklessness is a sufficiently culpable mental state for securities fraud. *Pirnik v Fiat Chrysler Autos.,* 2016 U.S. Dist. LEXIS 138439, at *20 (S.D.N.Y. Oct. 5, 2016). "Although this is a highly fact-based inquiry, the Second Circuit has held that where the complaint alleges that defendants had knowledge of facts or access to information contradicting their public statements, recklessness has been adequately pled." *In re Forest Labs. Sec. Litig*., 2006 U.S. Dist. LEXIS 97475, at *32 (S.D.N.Y. July 19, 2006).  "[T]o survive dismissal, plaintiffs must minimally allege that the defendants' conduct falls within the definition for recklessness." *In re Veeco Instruments, Inc. Sec. Litig*., 235 F.R.D. 220, 231 (S.D.N.Y. 2006) (emphasis added).  Moreover, in the Second

22

Circuit, all that is necessary to plead corporate scienter is that "the pleaded facts must create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter" or that the statements "would have been approved by corporate officials sufficiently knowledgeable about the company to know that [those statements were misleading.]" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (emphasis added); *accord*, *Loreley Fin. (Jersey) No. 3 v. Wells Fargo*, 797 F.3d 160, 177 (2d Cir. 2015).   The Complaint amply alleges that Defendants Dasilva and Nussey, and therefore Defendant Lightspeed, knew or should have known that they misled investors regarding Lightspeed's organic growth, in terms of both customer count and organic software and payments revenue growth for 3Q21 and 1Q22, and regarding the purpose and integration of the ShopKeep, Upserve, and Vend acquisitions during the Class Period.

### a.   Defendants' Monitoring of Key Metrics Contributes to the Compelling Inference of Scienter

Defendants represented in their Class Period filings that they "monitor…key performance indicators," including organic customer location count, which Defendant Nussey stated is "one of the most important metrics for us" and which the Company identified as a "primary driver of our business model." ¶ 70. Defendants have also always acknowledged that their "ability to increase the number of customer location served by our platforms is an indicator of our success in terms of market penetration and growth of our business."   Defendants' monitoring of this metric, and its significance to Lightspeed, supports a compelling inference of scienter as to the alleged misstatements regarding customer growth. *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter sufficiently pleaded where defendants "told the investing public that they monitored the value of their portfolio"). *See also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir. 2009) ("The perceived importance of margins supports an

23

inference that [the CFO] was paying close attention to these numbers"); *S. Ferry LP v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (allegations that the individual defendants had access to relevant corporate information and admissions that defendants closely monitored information supported scienter).

The most logical inference, therefore, is that the CEO and CFO monitored software and payments revenue closely, and paid particular heed to the impact on that revenue from over a billion dollars' worth of acquisitions in less than a year.

Moreover, Defendants Nussey and Dasilva signed Forms 52-109F2 with the SEC certifying that they each reviewed the quarterly Class Period financial reports and MD&As, and further representing that they "*exercised reasonable diligence*" to assure the veracity of the contents of those filings. Ex. P-L. On earnings calls following each quarterly filing, Defendants Nussey and Dasilva also *each* made misleading and exceedingly positive statements (*see* SOF, Section II.) that portrayed them as intimately knowledgeable on the subjects of customer count, organic software and payments revenue, the purposes behind the ShopKeep, Upserve, and Vend acquisitions, as well as the integration efforts relating to those acquisitions. *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010), as corrected (Sept. 30, 2010) (holding CEO "speaking so positively" supported recklessness).

Additionally, Lightspeed earns most of its revenue from "software and payments revenue," and Defendants have specified that the main source of that revenue is "subscription revenue" (which includes deferred revenue and trade receivables). *It has never earned a profit*. Given that Defendants spent *over a billion dollars* collectively on these three acquisitions, the most likely inference is that they had intimate knowledge of the relevant metrics of each company and how

24

those metrics impacted Lightspeed's key metrics. Viewed holistically, the Individual Defendants separate representations of intimate knowledge, combined with their representations as to the significance of organic customer count and organic subscription revenue, and their representations that they monitored KPIs, support the compelling inference of scienter. *See*, *e.g.*, *In re Salix Pharm., Ltd.*, 2016 U.S. Dist. LEXIS 54202 at \*46 (S.D.N.Y. Apr. 22, 2016) ("Defendant Derbyshire's statement concerning Salix's knowledge of precise inventory levels weigh[ted] in favor of scienter").

*Defendants do not contest these allegations of scienter and thus concede them. That alone should moot their scienter challenge.*

### b.    Defendants' Access to Information Contributes to the Compelling Inference of Scienter

CWs 1, 4, 5 and 7 explained that Lightspeed used Salesforce and the business intelligence software/data analytics platform Looker to track user count, monthly recurring revenue, and other key metrics. ¶ 50. *CW5 stated that Defendant Dasilva, Nussey, and President Chauvet had direct access to Salesforce and Looker, which CW5 knew "because they were always pulling reports."* *Id.* Moreover, every Friday, CW5 put together reports for "weekly board reviews" including reports on various metrics including monthly recurring revenue. *Id.* Defendants Nussey and Dasilva could also view metrics in an internal system known as "RAD." *Id.* Defendants' access to these metrics, particularly in light of their acknowledgment that they monitor key metrics, supports a compelling inference of scienter that is at least as compelling as any opposing inference. *See*, e.g., *Emps.' Ret. Sys. of Gov.'t of Virginia Islands v. Blanford*, 794 F.3d 297, 306 (2d. Cir. 2015) (recklessness occurs when corporate executives "knew facts or had access to information suggesting that their public statements were not accurate"); *In re Mylan N.V. Sec. Litig.*, 2018 U.S. Dist. LEXIS 52084, at \*35 (S.D.N.Y. Mar. 28, 2018) ("It requires no stretch of the imagination to

25

infer that, due to their positions at the company and the importance of [customer location count and software and payments revenue] to [Lightspeed's] operations, Defendants 'knew facts or had access to information suggesting that their public statements'…'were not accurate.'" (quoting *Novak*, 216 F.3d 300 at 311).[23]

Defendants argue that the Complaint's particularized allegations of "access to material information" do not suffice because they do not specify the exact content of each report or the precise dates on which Defendants Dasilva and Nussey pulled those reports. Def. Br. at 33. But as the Supreme Court has held, the plaintiff does not need a smoking gun to allege sufficient facts to support a strong inference of scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617 (S.D.N.Y. 2015). The Court should not ignore the common-sense inference from the facts alleged because "[a]lthough pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*., 19 F.4th 145, 150 (2d Cir. 2021).

### c.    Defendants' Discussion of KPIs and Acquisitions at Regular Meetings Attended By Multiple CWs Supports the Compelling Inference of Scienter

The Complaint alleges, as corroborated by multiple CWs with firsthand knowledge, that during the Class Period Defendants Dasilva and Nussey held regular meetings (post-acquisitions meetings, monthly companywide meetings, and weekly "bug ticket triage meetings") during which they discussed KPIs, including customer count in particular, and admitted that they acquired ShopKeep, Upserve, and Vend for the purpose of inflating Lightspeed's customer count.  ¶¶ 39-

---

[23] *See similarly In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *Yates v. Mun. Mortg. & Equity, LLC,* 744 F.3d 874, 890 (4th Cir. 2014); *Avaya*, 564 F.3d at 270; *SEC v. Pirate Investor LLC*, 580 F.3d 233, 243 (4th Cir. 2009).  Defendants also signed Sarbanes Oxley certifications that, when considered holistically, also contribute to a finding of scienter.  *See*, *e.g.*, *In re Eletrobras Sec. Litig.*, 245 F.Supp.3d at 468-69.

43.    These frequent meetings, which were not just attended by, but run by the Individual Defendants, demonstrate their intimate knowledge regarding Lightspeed's customer count and the purpose behind the Company's acquisition spree. *Speakes v. Taro Pharm. Indus.*, 2018 U.S. Dist. LEXIS 163281, at *23 (S.D.N.Y. Sep. 24, 2018) (finding scienter based on CW allegations that the individual defendants attended meetings where they spoke about the subjects forming the basis for the action); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (finding scienter met where the plaintiff alleged that "executives reviewed specific reports that should have alerted them to the problems they later allegedly misrepresented"); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 221-22 (S.D.N.Y. 2004) (finding scienter met based on individual defendant's position as "the executive most responsible for the Company's accounting" and attendance at meetings where issues were discussed).. Accordingly, "[D]efendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

The CWs not only confirmed the Individual Defendants' access to information, and admissions at regularly held meetings regarding the true purpose behind the acquisitions, but also confirmed that Defendants made no effort at integrating ShopKeep, Upserve, or Vend during the Class Period though publicly representing that "integration is well under way."  Their failure to undertake integration efforts while making statements to the contrary supports a compelling inference of scienter as to the allegations that Defendants pursued the acquisitions, not to leverage the acquirees' functionality and technology, but to inflate Lightspeed's own customer count and subscription revenue so as to mask its issues with organic growth.  Further supporting this allegation is the fact that the founders of all three companies left around the time of each acquisition, rather than remain with their companies to facilitate integration. Defs. Ex. A, at 62.

27

## 2.    The Complaint Adequately Alleges Motive

A motive to commit fraud exists where a defendant has a financial incentive to make misrepresentations to investors. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74 ("motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high, while selling their own shares at a profit."); *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214-15 (S.D.N.Y. 2018); *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179 (S.D.N.Y. 2009). While allegations of motive are not required, *see Tellabs,* 551 U.S. at 325, the Complaint pleads that insider ownership has been in rapid decline post-IPO, in part from both insider-selling and stock dilution for acquisitions. ¶ 51. At the time of the IPO, insiders owned 54%, but now own just 26% on a pro forma basis. *Id.* Indeed, Defendant Dasilva engaged in two unusually large transactions during the Class Period for proceeds of over $42 million.  *Id.* Immediately following the IPO and listing on the NYSE, Defendant Dasilva sold 238,456 shares of Lightspeed on September 15, 2020 at $30.50 a share for proceeds of $7,272,908. *Id.* Then on February 12, 2021, *eight days after issuing the February 4, 2021 misstatements,* Defendant Dasilva sold another 500,000 shares of Lightspeed for $70 a share for proceeds of $35,000,000. *Id.*[24]

Proffering a fact-based argument inappropriate for consideration at the pleading stage, Defendants argue that Defendant Dasilva's sales were not unusual (though the Complaint plainly alleges they were) and do not suffice to allege motive because he "sold more shares *before* the Class Period," citing to an exhibit showing a sale of shares on August 22, 2019—*i.e., a year before Lightspeed's U.S. IPO and listing on the New York Stock Exchange*—without providing any

---

[24] As Plaintiff has adequately pleaded a primary violation of Section 10(b), Defendants' only argument for dismissal of the secondary "control person" claims under Section 20(a) fails, Def. Br. at 34-35.  *See Yannes v. SCWorx Corp.*, 2021 U.S. Dist. LEXIS 116330, at *24 (S.D.N.Y. June 21, 2021).

information as to whether those sales yield proceeds anywhere near the over $42 million in proceeds Defendant Dasilva received from his sales *during the Class Period*.

The motive allegations considered holistically with the allegations of recklessness create an inference of scienter that is at least as compelling as any alternative inference.[25]

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Class Action Complaint ("Motion") should be denied in its entirety. In the event the Court grants Defendants' Motion, or any part of it, Plaintiff respectfully requests leave to amend. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead").

Dated: August 11, 2022

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
taweinrib@pomlaw.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

---

[25] The Individual Defendants' scienter is imputed to Lightspeed. *Gordon v. Vanda Pharms. Inc.*, 2021 U.S. Dist. LEXIS 911755, at *3 (E.D.N.Y. Mar. 10, 2021) (citing *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

29